**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE RETAIL PROPERTY TRUST, a Massachusetts business trust, *Plaintiff-Appellant*, | No. 12-56427 |
| | D.C. No. 8:10-cv-01605-CJC-AJW |
| v. | |
| UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA; CARPENTERS LOCAL UNION NO. 803; JAMES FLORES, an individual, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted
November 8, 2013—Pasadena, California

Filed September 23, 2014

Before: Ronald M. Gould and Jay S. Bybee, Circuit Judges,
and Edward M. Chen, District Judge.[*]

Opinion by Judge Bybee

---

[*] The Honorable Edward M. Chen, District Judge for the U.S. District Court for the Northern District of California, sitting by designation.

## SUMMARY**

### Labor Law

Reversing the district court's grant of a motion to dismiss state-law claims and a motion for judgment on the pleadings, and affirming the dismissal of a federal claim, the panel held that § 303 of the Labor Management Relations Act did not preempt state-law claims for trespass and private nuisance related to union activity that may also have constituted secondary boycott activity.

Disagreeing with the Seventh Circuit, the panel held that federal law does not so thoroughly occupy the field that it always preempts such claims. The panel held that the LMRA did not conflict with the plaintiff mall owner's trespass and nuisance claims because the claims touched interests deeply rooted in local feeling and responsibility, and the plaintiff sought only to enforce time, place, and manner restrictions against union protesters. The panel remanded the case to the district court for consideration of the state-law claims.

### COUNSEL

Stacey McKee Knight (argued) and Pamela Tsao, Katten Muchin Rosenman LLP, Los Angeles, California; Robert T. Smith, Katten Muchin Rosenman LLP, Washington, D.C., for Plaintiff-Appellant.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Yuliya S. Mirzoyan (argued) and Daniel M. Shanley, DeCarlo & Shanley, a Professional Corporation, Los Angeles, California, for Defendants-Appellees.

---

**OPINION**

BYBEE, Circuit Judge:

In this case we must decide whether § 303 of the Labor Management Relations Act ("LMRA"), codified at 29 U.S.C. § 187, preempts state-law claims for trespass and private nuisance related to union conduct that may also constitute secondary boycott activity. Following the reasoning of *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252 (1964), *Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wis. Empl. Relations Comm'n*, 427 U.S. 132 (1976), and *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180 (1978), we hold that federal law does not so thoroughly occupy the field that it always preempts such claims, nor does it conflict with the state law claims presented here. Where, as in this case, state claims of trespass and nuisance "touch[] interests deeply rooted in local feeling and responsibility," *Belknap, Inc. v. Hale*, 463 U.S. 491, 498 (1983), and the plaintiff seeks only to enforce time, place, and manner restrictions against union protesters, "we are unwilling to presume that Congress intended . . . to deprive the California courts of jurisdiction to entertain [the nuisance and] trespass action[s]." *Sears*, 436 U.S. at 207. We reverse the district court's grant of the defendants' motion to dismiss and remand the case to the district court for consideration of the state-law claims of trespass and nuisance against the defendants.

## I. FACTS

The Plaintiff-Appellant, Retail Property Trust ("RPT" or "the Mall"), owns Brea Mall in Brea, California. The Defendants-Appellees are United Brotherhood of Carpenters and Joiners of America Local 803; the Union's secretary-treasurer, James Flores; and fictitious defendants (collectively, "the Union"). According to the Mall's allegations, in 2010, one of the Mall's tenants, Urban Outfitters, contracted with non-union subcontractors to renovate the store in advance of its opening. Flores sent a letter to the Mall advising it of the Union's plans to pursue a labor dispute "under federal labor laws and the First Amendment of the United States Constitution, the California Constitution and California Labor Law." The Union advised that it would "choose the terms [it] deem[ed] appropriate in conveying [its] message, without censure" and that it would "publicize[]" its concerns "at the premises of everyone involved in the labor dispute to inform the public of the presence of a 'RAT' contractor."

The Mall is privately owned, but it has a policy for accommodating speech-related activities on its property. It developed its time, place, and manner restrictions to abide by the California Constitution's protection of "speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Robins v. Pruneyard Shopping Ctr.*, 592 P.2d 341, 347 (Cal. 1979), *aff'd sub nom. PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980); *see also* Calif. Const. art. I, § 2(a) ("Every person may freely speak, write and publish his or her sentiments on all subjects."). The Mall generally requires petitioners, solicitors, and protestors to fill out an application in advance, to agree to remain within one of two designated common

areas, and not to create noise of such volume as to impinge on the peace of the general public, obstruct pedestrian traffic, or damage or destroy any property. It also specifically prohibits "physical force, obscene language or gestures, or racial, religious or ethnic slurs," physical or verbal threats, or "any disturbance which is disruptive to the Center's commercial function."

The Mall's rules for public use of common areas specifically recognize "Qualified Labor Activity," such as "picketing and/or informational leafletting," as a special class of protected activity. Unlike other members of the public, labor organizations and their representatives may choose between conducting their activities in a designated area or in an alternate area chosen by the Mall "proximately located to the targeted employer or business." The Mall reserves the right to prohibit labor activity from areas that would threaten the personal safety of Mall patrons.

The Mall alleged that, beginning on October 1, 2010, and continuing on several occasions that month, dozens of union members violated these rules when they, having not filled out an application:

> came onto the Mall's privately owned common areas in front of the Urban Outfitters construction site and started a disruptive protest by marching in a circle, yelling, chanting loudly in unison, blowing whistles, hitting and kicking the construction barricade (which created a large hole in the barricade), and hitting their picket signs against the Mall railings, which created an intimidating and disquieting environment that interfered with

the Mall's and its tenants' normal operation of business.

The Mall alleged that union members also cat-called and made sexually provocative gestures toward female patrons and, at one point, "moved their protesting activities in front of two other tenant stores, neither of which had any relationship to Urban Outfitters or its contractor." Flores told the Mall manager that the Union would continue to picket and protest "until such time that the Mall either forced Urban Outfitters to stop their construction work or until the Mall closed down the [Urban Outfitters] construction." At no point during these protests was Urban Outfitters open for business. The Mall claimed it "received a number of complaints from its tenants, to whom it has a contractual obligation to provide a quiet and peaceful environment to conduct business."

The Mall filed its complaint in California Superior Court, alleging state-law claims for trespass and nuisance and seeking declaratory and injunctive relief. The Union immediately removed the case to federal court on the ground that the Mall had alleged the equivalent of unlawful secondary boycott activity in violation of § 303 of the LMRA. As a result, the Union argued, the state claims were not only preempted by federal law, but the Mall had also effectively stated a federal cause of action. *See Morton*, 377 U.S. at 261; *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1400 n.7 (9th Cir. 1988).

Section 303 prohibits, through cross-reference to 29 U.S.C. § 158, labor organizations or their agents from "threaten[ing], coerc[ing], or restrain[ing] any person engaged in commerce or in an industry affecting commerce,

where . . . an object thereof is . . . forcing or requiring any person to . . . cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). These are known as "secondary boycott activities," since they are directed at parties who are not involved in the labor dispute, as opposed to primary boycott activities in which a union pressures an employer to change its behavior. *See Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644–45 (1967). "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands." *Id.* at 627 n.16 (quoting *Int'l Bhd. of Elec. Workers, Local 501 v. NLRB*, 181 F.2d 34, 37 (2d Cir. 1950) (Hand., J.)); *see also Chipman Freight Servs. v. NLRB*, 843 F.2d 1224, 1227 (9th Cir. 1988).

In December 2010, the district court denied the Mall's request to remand the case to state court. The district court observed that "the sum of RPT's present allegations assert that Defendants have violated § 8(b)(4)(B) [29 U.S.C. § 158(b)(4)(B)] . . . . Specifically, RPT has alleged that Defendants' protests have been loud, destructive, and disruptive, causing RPT and its tenants to suffer damages." It noted that "RPT is itself a target of Defendants' pressure," since the Union threatened to force the Mall to close the Urban Outfitters construction if it did not prevent Urban Outfitters from hiring non-union subcontractors. The district court acknowledged that a defendant ordinarily cannot remove a case based on the assertion of a federal defense, but found there was a "complete preemption" exception where "any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore

arises under federal law." *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1107 (9th Cir. 2000); *see also Smart v. Local 702 Intl' Bhd of Elec. Workers*, 562 F.3d 798, 808 (7th Cir. 2009). The court concluded that "complete preemption [ ] applies," in this case, denied the motion to remand, and exercised supplemental jurisdiction over the Mall's trespass and private nuisance claims.

The district court gave the Mall leave to file an amended complaint, "in order to make clear that RPT did not intend to pursue any claim against Defendants beyond those related to Defendants' alleged violations of RPT's time, place and manner restrictions." The Mall filed its First Amended Complaint in January 2011 and renewed its motion to remand the case to state court. In the district court's March 2011 order on the renewed motion to remand, the court acknowledged that the Mall "eliminated many of its factual allegations regarding threats and other intimidating behavior by Defendants," but it held that the Mall still alleged that it "suffered injury and harm to its business interests and that the demonstrations obstructed Plaintiff and its tenants free use of its private property." The district court held that, because the Mall's "time, place and manner restrictions prohibit the same conduct that is prohibited under 29 U.S.C. § 158(b)(4) . . ., RPT's claims to enforce its time, place and manner rules are still completely pre-empted by the federal statute."

In July 2011, the Mall filed a Second Amended Complaint ("SAC"). It again included claims for trespass, private nuisance, and injunctive relief for unlawful acts by a union pursuant to California Labor Code § 1138.1, which specifies the requirements for a court to issue an injunction "in any case involving or growing out of a labor dispute."

Cal. Labor Code § 1138.1(a).**[1]** The SAC also included two important new paragraphs in the section labeled "Parties":

> 9. Plaintiff brings this action pursuant to Section 303 of the Labor Management Relations Act (29 U.S.C.A. § 187), hereinafter referred to as the LMRA, to recover damages for an illegal secondary boycott engaged in by the Defendants herein, together with the cost of this action. Plaintiff further brings this action pursuant to state-based property laws regarding the unapproved use and trespass on its private property.
>
> . . .
>
> 11. Jurisdiction is conferred on this court by the provisions of Section 303 and by 28 U.S.C.A. § 1331. The Court has pendent jurisdiction over Plaintiff's state-based property claims.

The Mall incorporated these paragraphs by reference into each state cause of action.

In September 2011, the district court granted in part and denied in part the Union's Rule 12(b)(6) motion to dismiss all of the Mall's claims. The court granted the motion with

---

**[1]** The third cause of action, which invoked § 1138.1, essentially restated the alleged trespassory and nuisance-causing activities of the Union and requested an injunction since the Mall "has no adequate remedy at law because monetary damage will not prevent Defendants from" trespassing and causing a nuisance.

respect to the Mall's claims for state-law trespass, private nuisance, and injunctive relief pursuant to of California Labor Code § 1138.1. It denied the motion to dismiss with respect to the cause of action added in Paragraph 9 of the SAC and initially brought pursuant to § 303. It again concluded, quoting *Smart*, 562 F.3d at 808, that § 303 of the LMRA "'completely preempts state-law claims related to secondary boycott activities described in § 158(b)(4)' and 'provides an exclusive federal cause of action for the redress of such illegal activity.'"

At that point, the only claim remaining in the suit was the § 303 claim. In January 2012 the district court dismissed the claim against Flores because a § 303 claim cannot be brought against a union member in his individual capacity. *See Broadmoor Homes, N. v. Cement Masons, Local 594*, 507 F. Supp. 55, 57 (N.D. Cal. 1981). Finally, on July 12, 2012, the district court granted a motion by the Mall to dismiss voluntarily the remaining § 303 claim pursuant to Federal Rule of Civil Procedure 41(a)(2).

On July 31, 2012, the Mall appealed the July 12, 2012 order dismissing the action with prejudice. It "directed" its notice of appeal at all of the district court's previous orders and did not otherwise specify which claims it was appealing. However, in its briefing before us, the Mall clarified that the sole issue presented is whether the district court erred in holding that "a state-law action for trespass and private nuisance is preempted by § 303 of LMRA simply because the invasion of property happened to involve a secondary boycott by a union." It argues that each of the district court's orders stemmed from a misapprehension of this issue and asks that the judgment of the district court be vacated in its entirety.

The Mall also asks that the district court be instructed to remand the case to state court.

## II. STANDARD OF REVIEW

We review *de novo* the district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Stone v. Travelers Corp.*, 58 F.3d 434, 436–37 (9th Cir. 1995). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), we must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008). To survive such a motion, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We also review the removal of the case from state court to federal court *de novo*. *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1194 (9th Cir. 1988).

## III.  ANALYSIS

The Mall's SAC alleged three causes of action: trespass, private nuisance, and injunctive relief for unlawful acts by a union pursuant to California Labor Code § 1138.1. The district court held that all three causes of action were "completely pre-empt[ed]" by § 303, because those state claims were "related to secondary boycott activities described

in section 158(b)(4)" and made actionable by § 303.**²** Section 303 provides:

> (a) It shall be unlawful . . . for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

> (b) Whoever shall be injured in his business or property by reason o[f] any violation of subsection (a) . . . may sue therefor in any district court of the United States . . . or in any other court having jurisdiction of the parties.

29 U.S.C. § 187.**³**

---

**²** Alternatively, the district court treated the three state causes of action as though they were components of a federal cause of action brought under § 303. In the background section of the SAC (and for the first time in the litigation), the Mall stated that it was bringing its action pursuant to § 303 for "an illegal secondary boycott." It recited § 303 as a basis for the exercise of federal jurisdiction under 28 U.S.C. § 1331, but it did not set forth a separate cause of action under § 303. Once the district court dismissed the Mall's state-law causes of action as state law claims, the Mall elected to dismiss voluntarily its § 303 claim and pursue this appeal. We limit our discussion to the issue decided by the district court and appealed by the Mall: whether the Mall's state-law claims of trespass and nuisance are preempted by § 303.

**³** We note that § 303 creates a federal cause of action and provides for jurisdiction. That section provides that a cause of action may be brought in any court, federal or state, that has personal jurisdiction over the parties. The question we address is whether § 303 is the *exclusive remedy* for conduct that may arise out of certain unfair labor practices defined in § 8 of the National Labor Relations Act. Section 303 does not provide for *exclusive jurisdiction*.

We proceed in three steps. First, to sharpen the issues before us, we address the difference between "complete" preemption and defensive preemption, often referred to as conflict or field preemption. Second, we discuss preemption under the National Labor Relations Act (NLRA), starting with *Garmon*[4] preemption and proceeding to *Machinists* preemption under § 303. Third, we apply these preemption principles to this case, covering both field preemption and conflict preemption.

## A.  *"Complete" Preemption v. Defensive Preemption*

This case comes to us in a somewhat unusual posture, and understanding the posture is critical to understanding the precise nature of the issue before us.  The Mall first filed this case in state court, and its complaint contained only state causes of action.  The Union removed the case to federal court on the basis of 28 U.S.C. § 1331, claiming that the Mall's action arose under federal law.  But the Union could only remove the action if the case could have been filed originally in federal court.  28 U.S.C. § 1441(a).  Because the Mall's complaint had only state-law claims and the parties were not diverse, the Mall could not have filed its suit in federal court in the first instance.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).

Even if the Union anticipated raising preemption as a federal defense, that would not have been grounds for removal.  *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).   "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a

---

[4] *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959).

federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar*, 482 U.S. at 392. "As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003). The well-pleaded complaint rule means that "a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar*, 482 U.S. at 393.

Under these principles, the district court here would have been obligated to decline jurisdiction over the Mall's complaint and remand to state court. After remand, the Union would have been free to assert its defense of federal preemption and ask the state court to dismiss the Mall's claims. The state court's judgment on any federal preemption defense then would have been reviewable by California appellate courts and, ultimately, by the U.S. Supreme Court. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 12 n.12 (1983).

The Supreme Court has recognized, however, an "independent corollary to the well-pleaded complaint rule known as the complete pre-emption doctrine." *Caterpillar*, 482 U.S. at 393 (internal quotation marks and citation omitted). That doctrine posits that there are some federal statutes that have such "extraordinary pre-emptive power" that they "convert[] an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins.*, 481 U.S. at 65. "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is

considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar*, 482 U.S. at 393. Accordingly, "[w]hen a plaintiff raises such a completely preempted state-law claim in his complaint, a court is obligated to construe the complaint as raising a federal claim and therefore 'arising under' federal law." *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005). We have commented that

> [c]omplete preemption is really a jurisdictional rather than a preemption doctrine, as it confers exclusive federal jurisdiction in certain instances where Congress intended the scope of federal law to be so broad as to entirely replace any state-law claim. Complete preemption is a limited doctrine that applies only where a federal statutory scheme is so comprehensive that it entirely supplants state law causes of action.

*Dennis v. Hart*, 724 F.3d 1249, 1254 (9th Cir. 2013) (internal quotation marks and citations omitted). We have referred to complete preemption as "super preemption," *Associated Builders & Contractors, Inc. v. Local 302 Int'l Bhd. of Elec. Workers*, 109 F.3d 1353, 1356 (9th Cir. 1997), and have said that its occurrence is "rare." *ARCO Envtl. Remediation, LLC v. Mont. Dep't of Health & Envtl. Quality*, 213 F.3d 1108, 1114 (9th Cir. 2000). Indeed, the Supreme Court has recognized only three instances of "complete jurisdiction."[5]

---

[5] The three are: (1) § 301 of the LMRA, 29 U.S.C. § 185, *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists*, 390 U.S. 557, 558–62 (1968); (2) § 502(a) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a), *Metro. Life Ins.*, 481 U.S. at 65–67; and (3)

The Union argued, and the district court agreed, that § 303 was another rare instance of "complete pre-emption," and that the Union could therefore remove the case to federal court. The district court relied on the decision of the Seventh Circuit in *Smart*, 562 F.3d at 798, in which that court held that § 303 "completely pre-empt[ed]" state antitrust law claims and authorized federal jurisdiction after removal. *Id.* at 808. (We discuss *Smart* in much greater detail below.)

Although the district court's reference to "complete pre-emption" of the state law claims in its ruling on the motion to dismiss was understandable in the context of the case, it was error. Once the district court established its subject matter jurisdiction over the SAC, the Union's assertion of preemption was a defense, not a grounds for removal. *See Martin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 944–46 (9th Cir. 2009). "Complete preemption" is a doctrine applicable to removal jurisdiction only; it is not a doctrine of defensive preemption, although there has been more than a little confusion in our cases and in the cases generally. It is going to be important for us to keep our terms straight.

In general, there are three forms of defensive preemption: express preemption, field preemption, and conflict preemption. These doctrines are well-established, and their contours are well-known to us—even if they are difficult to apply. *See Arizona v. United States*, 132 S. Ct. 2492, 2500–01 (2012); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). The relationship between "complete preemption" and defensive preemption is not entirely clear,

§§ 85 and 86 of the National Bank Act, 12 U.S.C. §§ 85, 86, *Beneficial Nat'l Bank*, 539 U.S. at 7–11.

although we agree that "[t]he complete-preemption doctrine must be distinguished from ordinary preemption." *Sullivan*, 424 F.3d at 272; *see also Balcorta*, 208 F.3d at 1107 n.7 ("In spite of its title, the 'complete preemption' doctrine is actually a doctrine of jurisdiction and is not to be confused with ordinary preemption doctrine (although it is related to preemption law)."); *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 n.4 (1st Cir. 2007) (referring to complete preemption as "[a] fourth species of preemption"). And, because complete preemption is rare, "[m]any federal statutes—far more than support complete preemption—will support a defendant's argument that because federal law preempts state law, the defendant cannot be held liable under state law." *Sullivan*, 424 F.3d at 272–73. We have occasionally—and always casually—equated complete preemption with field preemption. *See*, *e.g.*, *In re NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007) (referring to "complete field preemption"); *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003) ("[F]ederal law can preempt and displace state law through . . . field preemption (sometimes referred to as complete preemption)."); *ARCO Envtl. Remediation*, 213 F.3d at 1114 ("Preempted state law claims may be removed to federal court only in the rare instances where Congress has chosen to regulate the entire field."). The confusion is not peculiar to us. *See, e.g.*, *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 254 (8th Cir. 2012) (Beam, J., dissenting) ("Complete preemption (sometimes labeled field preemption). . . ."); *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) ("A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption."); *Lehmann v. Brown*, 230 F.3d 916, 919 (7th Cir. 2000) ("'[C]omplete preemption' is a misnomer, having nothing to do with preemption and everything to do

with federal occupation of a field."). It may well be that complete preemption is a species of field preemption; they bear a number of similarities. But it is also clear that field preemption and complete preemption are not co-extensive. For now, it is enough to say that the doctrines serve distinct purposes and should be kept clear and separate in our minds. *See Sullivan*, 424 F.3d at 273 n.7 ("It is true that the defense of field preemption and the doctrine of complete preemption both rest on the breadth, in some crude sense, of a federal statute's preemptive force. The two types of preemption are, however, better considered distinct.").

Once the district court acquired federal question jurisdiction under § 1331—not because the Union *removed* the case under a complete preemption theory, but because the Mall *pled* federal question jurisdiction in its SAC—the only preemption question remaining in this case is one of defensive preemption, not complete preemption.[6]  The

---

[6] The question whether the district court erred in denying the Mall's motions to remand is thus moot, as the Mall's assertion of federal jurisdiction in the SAC conferred jurisdiction upon the district court and hence upon us.

Had the district court coerced the Mall into amending its complaint in this way, we might conclude differently, *cf. O'Halloran v. Univ. of Wash.*, 856 F.2d 1375, 1378 (9th Cir. 1988), but no such coercion occurred here. After the denial of either of its motions to remand, the Mall could have brought an interlocutory appeal under 28 U.S.C. § 1292(b) or asked the district court to dismiss its claims to allow it to pursue a direct appeal under 28 U.S.C. § 1291. At the very least, when it filed its amended complaint, the Mall might have indicated to the district court that it was doing so solely in order to comply with the district court's order and asked the court to note its objections to that order. We hold the Mall, which was represented by sophisticated counsel, to the consequences of its choice to "thr[o]w in the towel" rather than take any

Union's only argument for dismissal is that the Mall's state claims are preempted by the LMRA, and that means that we must consider whether Congress expressly or impliedly preempted those claims.

We can dispense with any claim of express preemption: The Supreme Court itself has observed that "[t]he NLRA contains no express pre-emption provision." *Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 224 (1993). We thus turn to the question of implied preemption, "start[ing] with the basic assumption that Congress did not intend to displace state law" unless "it conflicts with federal law or would frustrate the federal scheme, or unless [we] discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Id.* (second alteration in original) (internal quotation marks and citations omitted). To decide those questions, we begin with background on the complex doctrine of preemption of state causes of action by federal labor law. We then turn to whether the Mall's state claims

---

of the aforementioned steps. *See Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 185 (7th Cir. 1984); *see also Moffitt v. Residential Funding Co., LLC*, 604 F.3d 156, 159 (4th Cir. 2010); *Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 56 (2d Cir. 1996).

In any event, moreover, the Mall did not raise any claim of coercion in its opening brief and has thus waived all argument on this point. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief.").

for trespass and nuisance in this case are pre-empted by § 303.[7]

## B. *Conflict Preemption and Field Preemption Under Federal Labor Law*

The NLRA, later modified by the LMRA, "marked a fundamental change in the Nation's labor policies" by recognizing the right of labor to organize and exercise economic power. *Sears*, 436 U.S. at 190. It both permits and prohibits certain conduct by employers and employees. Section 7 protects the right of employees "to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157, including the right to conduct pickets and consumer boycotts. *See NLRB v. Calkins*, 187 F.3d 1080, 1086–87 (9th Cir. 1999).

Section 8 bars "unfair labor practice[s]" by employers and by labor organizations. 29 U.S.C. §§ 158(a), 158(b). Section 8 makes it illegal "for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the NLRA, 29 U.S.C. § 157]." *Id.* § 158(a)(1). At the same time, it provides for a federal private cause of action for claims based on the conduct of labor organizations or their agents that constitute unfair labor practices, including secondary boycott activity. *See id.* § 158(b)(4)(B).

---

[7] The Mall makes no defense of the district court's dismissal of its claim for an injunction pursuant to California Labor Code § 1138.1, which itself largely reiterated the trespass and nuisance claims. The claim has been waived on appeal. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

Courts have addressed federal labor law preemption of state provisions largely on a case-by-case basis, and they have not always adhered to the conventional categories of conflict and field preemption. The United States Supreme Court initially took the position that "Congress did not exhaust the full sweep of legislative power over industrial relations," and thus found that the LMRA "leaves much to the states, though Congress has refrained from telling us how much." *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*, 346 U.S. 485, 488 (1953). It later observed that "Congress largely displaced state regulation of industrial relations." *Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986).

The contrast between the Court's pronouncements in *Garner* and *Gould* may not be as great as it appears at first. The Court has been more apt to find preemption when it is clear that the states are attempting to regulate the same conduct covered by federal law—that is, when states have promulgated their own labor codes. As *Gould* states, federal labor law has "largely displaced *state regulation of industrial relations.*" *Id.* (emphasis added). Nevertheless, even with respect to state regulation of labor relations, "Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety." *Metro. Life Ins.*, 471 U.S. at 756. Accordingly, "[f]ederal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act." *Id.* As we will see, the preemptive effect of the NLRA is less clear when state laws of general applicability affect labor relations, directly or obliquely. *See Sears*, 436 U.S. at 197 n.27; *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88,

104–08 (1992). The NLRA did not displace those areas where the "States traditionally have had great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metro. Life Ins.*, 471 U.S. at 756 (quoting *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 62 (1872) (quotation marks and citation omitted)).

Within the context of the NLRA, courts have described two special kinds of defensive preemption. *See Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008). "The first, known as *Garmon* pre-emption, 'is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the "integrated scheme of regulation" established by the NLRA.'" *Id.* (quoting *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 613 (1986)) (citation omitted). The second type of preemption, "known as *Machinists* pre-emption, forbids both the [NLRB] and States to regulate conduct that Congress intended 'be unregulated because left 'to be controlled by the free play of economic forces.'" *Id.* (quoting *Machinists*, 427 U.S. at 140) (internal quotation marks and citations omitted).

In order to decide this case, we first review the distinct NLRA preemption principles of *Garmon*. The parties concede that *Garmon* itself is not in play here, but the principles set out in *Garmon*—and applied in *Sears*—are essential to understanding *Morton* and *Machinists*, the § 303 cases articulating the preemption doctrine we apply in this case. We first discuss *Garmon* and *Sears* and then turn to *Morton* and *Machinists*.

### 1.  *Garmon* and *Sears*

*Garmon* preemption deals specifically with when a labor matter must be brought before the NLRB, a complicated doctrine known as primary jurisdiction. *See Golden State Transit Corp.*, 475 U.S. at 613 ("The *Garmon* rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA." (internal quotation marks and citation omitted)); *Associated Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979, 987 (9th Cir. 2004). In this case, the Mall had "no right to invoke [the Board's primary] jurisdiction," and the Union—the party that could have brought the matter before the Board—failed to do so.  Accordingly, *Garmon* preemption is not at issue here.  *Sears*, 436 U.S. at 207.  But *Garmon*'s principles of labor law preemption underlie *Morton* and its progeny, which, as discussed below, are important to our analysis in this case.

In *Garmon*, a union picketed an employer to force the employer to sign a union-shop contract. *Garmon*, 359 U.S. at 237. The employer first sought to bring the matter before the NLRB, but the Board declined jurisdiction. *Id.* at 238. The employer then filed suit in California Superior Court, arguing that the union had committed a tort based on a state unfair labor practice law.  The California court awarded damages to the employer, but the U.S. Supreme Court reversed. *Id.* The Court acknowledged that it was unclear whether the union's conduct was *protected* under § 7 of the NLRA or *prohibited* under § 8. *Id.* at 245. The Court focused on whether the NLRB had primary jurisdiction to make that determination: "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the

exclusive competence of the [NLRB] if the danger of state interference with National policy is to be averted." *Id.* at 245. After *Garmon*, the focus of the NLRB's primary jurisdiction is the *potential* for conflict with federal policy. *Id.* at 246 ("The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy.").

Although *Garmon*'s "arguably subject to" language suggested a broad preemption doctrine, the Court also reaffirmed that there were limits on federal preemption of state laws of general applicability. The Court emphasized two considerations, both rooted in federalism, that bear on those limits. First, in light of "the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy," the NLRA did not "withdraw[] from the States [ ] power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act." *Id.* at 243. Second, the States retained power to regulate "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 244. Such local interests included "violence and imminent threats to public order," because "the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." *Id.* at 247. The Court concluded there was "no such compelling state interest" present on the facts of *Garmon*. *Id.* at 248.

By contrast, in *Sears*, 436 U.S. at 180, the Court found deeply local interests to be at stake, such that *Garmon* preemption was inappropriate. The issue before the Court in *Sears* was whether the NLRA "deprives a state court of the power to entertain an action by an employer to enforce state trespass laws against picketing which is arguably—but not definitely—prohibited or protected by federal law." *Id.* at 182. The case arose when a Sears store brought a state trespass action against a union after union members—angered that the store was employing non-union carpenters—refused to comply with Sears' demand that the union cease its picketing activities on its property. *Id.*

The state trial court granted a preliminary injunction, and the California Court of Appeal affirmed, concluding "that the Union's continuing trespass fell within the longstanding exception for conduct which touched interests so deeply rooted in local feeling and responsibility that pre-emption could not be inferred in the absence of clear evidence of congressional intent." *Id.* at 183 (citing *Garmon*, 259 U.S. at 236). However, the California Supreme Court reversed, concluding that since the picketing was both arguably protected by § 7 of the NLRA and arguably prohibited by § 8, "state jurisdiction was pre-empted under the *Garmon* guidelines." *Id.* at 184. The U.S. Supreme Court granted certiorari, noting that it had until then "not decided whether, or under what circumstances, a state court has power to enforce local trespass laws against a union's peaceful picketing." *Id.*

The Court began with the observation that Sears had brought only a trespass claim. Sears had asserted "no claim that the picketing itself violated any state or federal law," and the store "sought simply to remove the pickets from its

property . . . . Thus, as a matter of state law, the location of the picketing was illegal but the picketing itself was unobjectionable." *Id.* at 185. The Court had allowed states "to enforce certain laws of general applicability even though aspects of the challenged conduct were arguably prohibited by § 8 of the NLRA," including laws that fell within *Garmon*'s "local feeling and responsibility" exception. *Id.* at 195 (quoting *Garmon*, 359 U.S. at 244). It cited examples of claims that were not preempted by federal law, including: threats of violence, violence, libel, and intentional infliction of mental distress. *Id.* (collecting cases). It contrasted these cases with state laws, such as antitrust laws, that conflict with the LMRA when "brought to bear on *precisely the same conduct*" that is arguably prohibited by § 8. *Id.* at 194 (emphasis added) (internal quotation marks and citations omitted). Reviewing the cases, the Court identified two relevant "factors which warranted a departure from the general pre-emption guidelines in the 'local interest' cases": First, there was "a significant state interest in protecting the citizen from the challenged conduct," and second, although "the challenged conduct occurred in the course of a labor dispute and an unfair labor practice charge could have been filed, the exercise of state jurisdiction over the tort claim entailed little risk of interference with the regulatory jurisdiction of the Labor Board." *Id.* at 196.

In the context of state laws touching on conduct that is arguably prohibited by the NLRA, the Court reduced these two factors to a single test: "The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is *identical to . . . or different from . . .* that which could have been, but was not, presented to the Labor Board." *Id.* at 197 (emphasis added).

Only if the controversy is identical to a claim that could have been presented to the Board would a state court's exercise of jurisdiction involve "a risk of interference with the unfair labor practice jurisdiction of the Board." *Id.*

The Court concluded that in that case "the controversy which Sears might have presented to the Labor Board is not the same as the controversy presented to the state court." *Id.* at 198. If Sears had filed a charge with the NLRB, "the federal issue would have been whether the picketing had a recognitional or work-reassignment objective; decision of that issue would have entailed relatively complex factual and legal determinations completely unrelated to the simple question whether a trespass had occurred." *Id.* On the other hand, Sears' state action "only challenged the location of the picketing; whether the picketing had an objective proscribed by federal law was irrelevant to the state claim." *Id.* Therefore, the exercise of state jurisdiction of the trespass claim "would create no realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices." *Id.* The "arguable illegality of the picketing" did not deprive state courts of jurisdiction "to enjoin its trespassory aspects." *Id.* at 190.[8]

---

[8] The *Sears* Court made the above observations with respect to the prong of the *Garmon* test addressing conduct arguably prohibited by the NLRA. It noted, however, that "[c]onsiderations of federal supremacy . . . are implicated to a greater extent when labor-related activity is protected than when it is prohibited." *Sears*, 436 U.S. at 200. Such considerations were mitigated, on the facts of *Sears*, by the ability of the union to invoke the jurisdiction of the NLRB. *Id.* at 201. The Court concluded that the "[p]rimary-jurisdiction rationale does not provide a *sufficient* justification for pre-empting state jurisdiction over arguably protected conduct when the party who could have presented the protection issue to the Board has not done so and the other party to the dispute has no acceptable means of

2. *Morton* and *Machinists*

The Court extended *Garmon*'s principles to the context of § 303 suits in *Morton*, 377 U.S. at 252. There, during a strike, the petitioner labor union engaged in secondary activities to induce customers and suppliers to cease dealing with the respondent employer. *Id.* at 253–54. The respondent filed suit in federal court for violation of § 303 and an Ohio law similar to the tort of tortious interference with a prospective business advantage. *Id.* at 254. The trial court awarded the respondent compensatory damages because the union had encouraged employees of a third-party to force their employer to stop doing business with the respondent (in violation of § 303), the union had persuaded the management of one of the respondent's customers to cease doing business with the respondent (in violation of state law), and the union had caused the loss of a contract because there were not enough employees available during the strike to perform the contract (also in violation of state law). *Id.* at 255–56. Even though the strike was peaceful, the trial court also awarded punitive damages. *Id.* at 256.

The U.S. Supreme Court reversed. It first held that the union's attempts to induce the employees of the third party to coerce their employer into refraining from conducting business with the respondent were "a clear violation of § 303." *Id.* at 256. The Court then took up the question "whether a court, state or federal, is free to apply state law in awarding damages resulting from a union's peaceful strike conduct vis-a-vis a secondary employer." *Id.* at 256. Quoting *Garmon*, the Court acknowledged that § 303 did not preempt *all* actions arising out of secondary union activity:

doing so." *Id.* at 202–03.

> [W]e have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction.

*Id.* at 257 (quoting *Garmon*, 359 U.S. at 247–48) (alteration in original) (internal citations omitted).

Nonetheless, the Court found those considerations "entirely absent in the present case." *Id.* It described the state law at issue as an "Ohio law of secondary boycott" that, by regulating conduct that Congress chose to leave unregulated in § 303, "frustrate[d] the congressional determination to leave this weapon of self-help available" to unions. *Id.* at 259–60. The Court held that the Ohio-law claims were "displaced by § 303 in private damage actions based on peaceful union secondary activities." *Id.* at 261. The Court also concluded that the preemptive scope of § 303 extended to claims for punitive damages for secondary activities which violated only state law. *Morton*, 377 U.S. at 260–61 ("[I]nsofar as punitive damages in this case were based on secondary activities which violated only state law, they cannot stand, because, as we have held, substantive state law in this area must yield to federal limitations. . . . Accordingly, we hold that since state law has been displaced by § 303 in private damage actions based on peaceful union secondary activities, the District Court in this case was without authority to award punitive damages.").

In *Machinists*, the Court further explained the new form of preemption described in *Morton*. There, an employer's dispute with its union regarding the length of the workweek led to the union's adopting a resolution forbidding its members to work any overtime, defined as time in excess of 37.5 hours per week. 427 U.S. at 134. In addition to filing a complaint regarding the no-overtime resolution with the NLRB, the employer filed a separate complaint before Wisconsin's state labor agency, which entered an order enjoining the union from enforcing the resolution. *Id.* at 135–36. The Wisconsin courts upheld the order. *Id.*

The Court considered whether, assuming that the NLRB did not have primary jurisdiction (per *Garmon*), Congress nonetheless "intended that the conduct involved be unregulated [by states] because left to be controlled by the free play of economic forces," as in *Morton*. *Id.* at 140 (internal quotation marks omitted); *see also id.* at 147–48 (explaining that the "crucial inquiry" under *Morton* is "whether the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the [NLRA]'s processes" (internal quotation marks omitted)). The Court observed that there was no evidence that the no-overtime resolution "was enforced by violence or threats of intimidation or injury to property." *Id.* at 154. Rather, the no-overtime resolution was "peaceful conduct"—purely economic self-help that Congress had intended to leave available to workers. *Id.* at 155. Accordingly, the Court held, state interference with such activity would frustrate the purposes of federal labor law and was preempted under *Morton*, because "Congress meant that these activities, whether of employer or employees, were not to be regulable by States any more than by the NLRB." *Id.* at 149.

C. *Preemption in This Case*

With that background, we are prepared to discuss whether § 303 preempts state actions in trespass and nuisance. Because we conclude that § 303 does not preempt all such claims (under field preemption), we then consider whether, in the circumstances of this case, the Mall's claims conflict with § 303 (under conflict preemption).

1. Field Preemption

The district court, following the Seventh Circuit's decision in *Smart*, held that § 303 "completely preempts" claims related to secondary boycotts, a conclusion that we construe to be based on field preemption, as we have explained. We think the district court's decision is contrary to *Morton* and *Sears* and that the Seventh Circuit's broad statement in *Smart* is simply wrong.

*Morton* did not hold that § 303 preempts all state causes of action that may affect secondary boycotts. To the contrary, it allowed that "in cases involving union violence, state law has been permitted to prevail." *Morton*, 377 U.S. at 257.

*Morton* was followed by *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966). Gibbs brought suit in federal court against the United Mine Workers of America, alleging violation of § 303 and Tennessee tort laws prohibiting unlawful conspiracy to interfere with contractual agreements. *Id.* 719–20. The district court held that Gibbs had no claim under § 303 but allowed a verdict on the state claims. *Id.* 720–21. Because the federal claims were dismissed, the question before the Supreme Court was whether the district court properly exercised pendent jurisdiction over the

remaining state claims.  The Court observed that the state claims were not preempted under *Morton* because Gibbs had alleged violence and intimidation.  *Id.* at 721.  Significantly, the Court stated that "the allowable scope of the state claim implicates the federal doctrine of pre-emption;" the state claim did not, however, "create statutory federal question jurisdiction."  *Id.* at 727 (citing *Louisville & N. R. Co. v. Mottley*, 211 U.S. 149 (1908)).  The Court then emphasized that some state causes of action are not preempted by § 303: "This Court has consistently recognized the right of States to deal with violence and threats of violence appearing in labor disputes, sustaining a variety of remedial measures against the contention that state law was pre-empted by the passage of federal labor legislation."  *Id.* at 729 (citations omitted).

*Morton* and *Gibbs* show that § 303 does not so fully occupy the field such that any claim related to secondary boycotts must be brought under § 303 or not all. Our reading of *Morton* comports with several sister circuits, which have emphasized that the *Morton* "Court was careful to limit its holding."  *Gulf Coast Bldg. & Constr. Trades Council v. F.R. Hoar & Son, Inc.*, 370 F.2d 746, 748 (5th Cir. 1967); *see Peabody Galion v. Dollar*, 666 F.2d 1309, 1316 (10th Cir. 1981) (describing *Morton*'s application to a "small class of cases"); *see also BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 90 F.3d 1318 (8th Cir. 1996) (comparing *Morton* and *Gibbs* and concluding "[s]tates may [ ] regulate" union secondary activity that is violent or threatens public order); *Iodice v. Calabrese*, 512 F.2d 383, 390 (2d Cir. 1975) (holding damages under state law were unavailable "[s]ince the district court . . . found no evidence of violence" and *Morton* held § 303 displaced actions based on peaceful union secondary activities); *Gulf Coast Bldg.*, 370 F.2d at 748 ("Section 303 . . . has been held

to pre-empt state common law *only* when peaceful boycotts are involved." (emphasis added)).

*Sears*, for its part, simply confirmed what the Court said in *Garmon* and repeated in *Morton*: Trespass is one "threat[] to public order" that is not totally preempted by the NLRA. *Garmon*, 359 U.S. at 247. *Sears* expanded the Court's discussion in *Garmon* of what torts a union might be liable for under state law where its picketing was either "arguably protected" under § 7 or "arguably prohibited" under § 8. *See Sears*, 436 U.S. at 190. Acknowledging that "some violations of state trespass laws may be actually protected by § 7," *id.* at 204, the Court nevertheless held that it was "unwilling to presume that Congress intended the arguably protected character of the Union's conduct to deprive the California courts of jurisdiction to entertain Sears' trespass action." *Id.* at 207. If a union's "arguably protected" conduct is not necessarily preempted by the NLRB's primary jurisdiction under § 7, we are hard pressed to understand how conduct arguably covered by § 303 must be preempted in toto.

*Sears*' analysis of whether trespass was "arguably prohibited" by § 8—a subsection of which is enforceable through a private right of action under § 303—likewise gives us confidence that state tort actions are not fully preempted by § 303. Indeed, in *Sears*, the Court acknowledged that even when "an unfair labor practice charge *could have been filed* [with the NLRB]," the state still had an interest in protecting its citizens where "the exercise of state jurisdiction over the tort claim" would not interfere with the NLRB. *Id.* at 196 (emphasis added). "[These] factors . . . warranted a departure from the general pre-emption guidelines." *Id.* at 196 (emphasis added). The Court found that because "Sears only challenged the location of the picketing," not its objective,

"the controversy which Sears might have presented to the [NLRB] is not the same as the controversy presented to the state court." *Id*. at 198. *Sears* is conclusive evidence that the NLRA does not "so thoroughly occup[y the] legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone*, 505 U.S. at 516 (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982) (internal quotation marks and citation omitted)).

We have held as much by implication. In *San Antonio Community Hospital v. Southern California District Council of Carpenters*, 125 F.3d 1230 (9th Cir. 1997), the plaintiff filed a complaint in federal court alleging a federal claim under § 303 and various state tort claims—libel, trade libel, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and interference with contractual rights. *Id.* at 1233–35. The district court preliminarily enjoined the respondent union's picket. *Id.* at 1232. On appeal, citing *Morton*, we observed that "interference with prospective economic advantage and contractual rights claims are preempted by section 303 of the LMRA. And an employer cannot seek injunctive relief from a secondary boycott under section 303." *Id.* at 1235 (citation omitted). Accordingly, we moved on to consider the propriety of an injunction in light of the other state tort claims, ultimately concluding that relief would be based on the hospital's defamation claims. *Id.* at 1239. If we had believed that § 303 covered the field, we would have dismissed all of the state court torts as preempted, but we did not. We did not

then, and we do not now, believe that § 303 leaves no room for state action.[9]

The district court concluded differently. It relied on the Seventh Circuit's decision in *Smart* to hold that § 303 preemption is "complete." *Smart*, 562 F.3d at 808. We think *Smart* is not persuasive on this point and, indeed, is contrary to *Morton* and *Sears*.

In *Smart*, the plaintiff was the sole proprietor of a non-union electrical company that contracted to perform work for the construction of a sports complex. *Id.* at 801. Smart alleged that, after he entered into the contract, the International Brotherhood of Electrical Workers, Local 702, "coerced" the owner of the sports complex to terminate his relationship with Smart by threatening "to withhold services and otherwise to shut down the building project if the owner did not employ union workers instead of Mr. Smart." *Id.* Smart filed suit in federal court and "included only state causes of action in his complaint," among them a claim under the Illinois Antitrust Act. *Id.* at 803.

---

[9] In *Ethridge v. Harbor House Restaurant*, 861 F.2d at 1389, we observed that the Supreme Court has "noted that Congress has created some exceptions to the [NLRB's] exclusive jurisdiction. Thus, cases involving section 8(b)(4) are removable, *see* 29 U.S.C. § 187, as are cases for breach of a collective bargaining agreement, *see* 29 U.S.C. § 185." *Id.* at 1400 n.7 (citation omitted). *Ethridge* says nothing about "complete preemption" but correctly states that §§ 301 and 303 are statutory exceptions to the NLRB's exclusive jurisdiction.

The Seventh Circuit held that Smart's "state antitrust claim [wa]s preempted by federal law." *Id.* at 804.[10] It noted that "the activities described by Mr. Smart in his complaint," specifically the union's threats to "shut the project down if [the owner] continued to use Mr. Smart," fell within § 158(b)(4)'s prohibition on secondary boycott activities. *Id.* (alteration in original) (internal quotation marks omitted).

The court in *Smart* treated the question of the NLRB's exclusive jurisdiction under *Garmon* and the question of complete preemption under § 303 as two different questions. The Seventh Circuit held that *Garmon* preemption was not "complete," *id.* at 805, but then held that preemption was complete under § 303. *Id.* at 808. The court asked whether, in § 303, "Congress meant to 'exercise [the] extraordinary pre-emptive power . . . that converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Id.* at 807 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). It then noted that the Supreme Court in *Metropolitan Life Insurance Company* had compared a provision in ERISA to § 301 and found that both provisions were subject to the complete preemption rule that permits

---

[10] The procedural posture of *Smart* is complicated. Smart filed his suit in federal court, alleging only state claims and asserting diversity jurisdiction. The Seventh Circuit found that the parties were not diverse, but instead of dismissing the suit, it requested supplemental briefing from the parties on whether the court had jurisdiction because there was complete preemption under *Garmon*. *See Smart*, 562 F.3d at 803–05 & n.6. The court held that there was not "complete pre-emption" under *Garmon*, but that there was complete preemption under § 303. The court then concluded that it had subject matter jurisdiction and that Smart's state claims were preempted by § 303. It then remanded with instructions to allow Smart to re-plead his case under § 303. *Id.* at 808–09.

removal of cases filed in state court, even if the complaint raises only state claims. *See Metro. Life Ins.*, 481 U.S. at 63–67. Finding that § 303 "mirrors the broad language" of § 301,[11] *Smart* concluded that § 303 "*completely* preempts state-law claims related to secondary boycott." *Smart*, 562 F.3d at 808.

The *Smart* court failed to cite *Morton* at all and, in our view, *Morton* is contrary and conclusive. *Smart*'s analogy of § 303 to § 301 might have been reasonable under other circumstances, but there is no reason to resort to analogies here; *Morton* tells us directly that § 303 is compatible with some state causes of action. As we and other courts have long recognized, § 303 does not displace all state actions that are in some way related to a secondary boycott. *See, e.g.*, *Gulf Coast Bldg.*, 370 F.2d at 748 (holding that claims under Mississippi law for violent or willful tortious conduct were not preempted by § 303); *Brown & Sharpe Mfg. Co. v. All Individual Members of Lodges 1088 & 1142 of Dist. No. 64 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 535 F. Supp. 167, 170 (D.R.I. 1982) (holding that Rhode Island tort claims based on union violence were not

---

[11] Section 301(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

preempted); *J. Landowne Co. v. Paper Box Makers & Paper Specialties Union, Local 299*, 278 F. Supp. 339 (E.D.N.Y. 1967) (holding that claims under New York tort law for violence and malicious destruction were not preempted by § 303); *see also Offices at 2525 McKinnon, LLC v. Ornelas*, 681 F. Supp.2d 778, 784–85 (N.D. Tex. 2010); *Brawn v. Coleman*, 167 F. Supp.2d 145, 153 (D. Mass. 2001).[12]

We do not doubt that there are some claims that *will* be preempted by § 303. *Smart*, for example, involved a claim under the Illinois Antitrust Act, and antitrust has long been an area of particular concern to labor law, since "there is an inherent tension between national antitrust policy, which seeks to maximize competition, and national labor policy, which encourages cooperation among workers to improve the conditions of employment." *H. A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 713 (1981); *see also Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 635–37 (1975). Until Congress established exceptions to antitrust laws for union activity, courts often relied on antitrust laws to enjoin strikes as unlawful restraints on trade. *See H.A. Artists*, 451 U.S. at 713; *see also* 15 U.S.C. § 17 ("Nothing contained in the antitrust

---

[12] We note, moreover, that § 303, unlike § 301, expressly provides for concurrent state-court jurisdiction. *Compare* 29 U.S.C. § 185 ("Suits for violation for contracts between an employer and a labor organization . . . may be brought in any district court of the united States having jurisdiction of the parties . . . ."), *with id.* § 187(b) ("Whoever shall be injured in his business or property by reason o[f] any violation of subsection(a) of this section may sue therefor in any district court of the United States . . . *or in any other court having jurisdiction of the parties* . . . ." (emphasis added)). This contrast is further evidence that Congress did not intend that § 303 occupy the field to the categorical exclusion of state law.

laws shall be construed to forbid the existence and operation of labor . . . organizations"); 29 U.S.C. § 105 ("No court" shall have jurisdiction to enjoin a labor dispute on the grounds that it is an "unlawful combination or conspiracy"); 2 John E. Higgins, Jr., *The Developing Labor Law* 2564–96 (6th ed. 2012) (detailing the relationship between the NLRA and federal antitrust laws).

Similarly, a number of courts have found preemption of state causes of action addressing economic harms. *See, e.g.*, *BE & K Constr. Co.*, 90 F.3d at 1327–30 (holding that, because there was insufficient evidence of union violence, claim under Arkansas law for tortious interference with contractual relations was preempted by § 303); *Iodice*, 512 F.2d at 390 (holding that claim under New York law for tortious interference with contractual relations did not involve violence and was preempted by § 303); *Hennepin Broad. Assocs., Inc. v. NLRB*, 408 F. Supp. 932 (D. Minn. 1975) (holding that Minnesota claims for tortious interference with business relations and contracts was preempted by § 303).

In the instant case, however, the Mall alleges property-based torts, rather than economic causes of action. The Mall is not seeking to prevent or punish labor conduct, but only conduct that violates the Mall's time, place, and manner rules. Thus, this suit is not, fundamentally, a labor case in the guise of an action in trespass; it is a trespass case complaining only incidentally, at most, about union conduct. In light of *Morton*, we conclude that § 303 does not fully preempt any suit that is based on conduct arguably prohibited by the secondary boycott provisions of § 8 and made actionable by § 303.

### 2. *Conflict Preemption*

Although we disagree with *Smart* and the district court that § 303 preempts *all* causes of action that regulate conduct arguably prohibited by the secondary boycott provisions of § 8, our inquiry does not end there. We still must determine whether the Mall's state claims are preempted by § 303 in this case because they "conflict[] with federal law." *Bldg & Constr*. *Trades Council*, 507 U.S. at 224. Because *Garmon* preemption does not apply in this case, *see supra*, we look to *Machinists* preemption to decide this question and inquire "whether the exercise of state authority [via trespass and nuisance law] to curtail or entirely prohibit self-help would frustrate effective implementation of the policies of the [NLRA]." *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 531 (1979).

For several reasons, we do not think that adjudication of the Mall's trespass and nuisance claims would "impinge on [any] area of labor combat designed to be free," *Morton*, 377 U.S. at 260 (internal quotation marks omitted), and thus would not "frustrate effective implementation" of federal labor policy. First, as a general matter, trespass and nuisance are labor-neutral torts, far afield indeed from areas of state law, such as antitrust, that most commonly raise preemption concerns. Instead of directly regulating relations between unions and employers, trespass and nuisance law instead largely touch on noneconomic "interests . . . deeply rooted in local feeling and responsibility." *See, e.g.*, *Sears*, 436 U.S. at 195–97; *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage*

*Hospitality Res., LLC*, 390 F.3d 206, 212 n.4 (3d Cir. 2004).[13] It is as true in the context of *Machinists* preemption as in that of *Garmon* preemption that we ought not be quick to "infer that Congress ha[s] deprived the States of the power to act" with respect to such local interests. *Machinists*, 427 U.S. at 136; *see also, e.g.*, *Golden State Transit Corp. v. City of Los Angeles*, 686 F.2d 758, 759–60 (9th Cir. 1982). Under either of these forms of preemption, "the federal law governing labor relations does not withdraw 'from the States . . . power to regulate where the activity regulated [is] a merely peripheral concern of the Labor Management Relations Act.'" *Machinists*, 427 U.S. at 137 (quoting *Garmon*, 359 U.S. at 243) (alteration in original).[14]

---

[13] Trespass has been discussed much more extensively than nuisance in the case law on both *Garmon* and *Machinists* preemption, but—at least in California—the two torts are often interrelated and thus entail markedly similar considerations. *See KFC W., Inc. v. Meghrig*, 28 Cal. Rptr. 676, 685 (Cal. Ct. App. 1994) ("Because the creation of either a private or public nuisance is tortious, such conduct may support a claim for trespass."); 5 Witkin, Summary of California Law Torts, § 693, at 1018 (10th ed. 2005) ("Trespass and nuisance are separate torts that protect different interests, although the same conduct may invade both."); *cf. Helmsley-Spear, Inc. v. Fishman*, 900 N.E.2d 934, 937–38 (N.Y. 2008) (holding that a suit brought in nuisance arising out of the union's drumming outside of the plaintiff's premises was not preempted by federal labor law because "[t]he tort of private nuisance, much like the tort of trespass, has historically been governed by state law. It cannot be said that Congress, by enacting the NLRA, intended to preempt states from protecting their citizens from obnoxious conduct.").

[14] While we may not lightly infer that Congress intended to preempt state laws of general applicability that touch on deeply rooted local interests, there are nonetheless circumstances where such laws *will* frustrate effective implementation of federal labor policy and thus be preempted. *See, e.g.*, *San Antonio Cmty. Hosp.*, 125 F.3d at 1235 ("[L]ibel actions under state law [are] pre-empted by the federal labor

Second, and more importantly, the particular facts of this case suggest that it will work no interference with the purposes of federal labor law. The Mall claims not the right to quash *all* protest activity by the Union—an expansive claim that would present a much harder question with respect to *Machinists* preemption—but only the right to prevent Union members from "yelling, chanting loudly in unison, blowing whistles, hitting and kicking [a] construction barricade . . . and hitting their picket signs against the Mall railings." Such threatening activity is not a "weapon of self-help" that Congress intended to leave available to unions. *Cf. Farmer v. United Bhd. of Carpenters & Joiners, Local 125*, 430 U.S. 290, 299 (1977) ("Nothing in the federal labor statutes protects or immunizes from state action violence or the threat of violence in a labor dispute" (citations omitted)). The sort of "peaceful" protest activities that *Machinists* preemption *does* squarely protect from state interference are left available by the Mall's relatively modest time, place, and manner restrictions. *See Morton*, 377 U.S. at 259–60.[15]

---

laws to the extent that the State [seeks] to make actionable defamatory statements in labor disputes which were published without knowledge of their falsity or reckless disregard for the truth." (internal quotation marks omitted)).

[15] The free-speech provision of the California Constitution, moreover, has been recognized to be "more definitive and inclusive than the First Amendment" of the United States Constitution, *Wilson v. Superior Court*, 532 P.2d 116, 120 (Cal. 1975), and the California Supreme Court has specifically extended that provision's protection to expressive activity in privately owned shopping malls. *See Pruneyard*, 592 P.2d at 347. This permissive legal framework gives us additional confidence that any state regulation here will not interfere with the Union's activities to a sufficient extent to cause concern under *Machinists*.

As the *Sears* Court held in the related context of *Garmon* preemption, we hold that *Machinists* preemption does not "sweep[] away state-court jurisdiction over conduct traditionally subject to state regulation." *Sears*, 436 U.S. at 188. Where, as here, a plaintiff's claims for trespass and nuisance fall "within the longstanding exception for conduct which touche[s] interests so deeply rooted in local feeling and responsibility that pre-emption could not be inferred in the absence of clear evidence of congressional intent," *id.* at 183, and concern only the application of time, place, and manner restrictions to raucous and threatening picket activity, *cf. id.* at 185, federal preemption does not bar the plaintiff's claims from going forward, because the conduct at issue is, at most, "a merely peripheral concern" of federal labor law. *Machinists*, 427 U.S. at 137. To conclude otherwise would be to expand *Machinists* preemption beyond its proper scope.

## IV. CONCLUSION

We reverse the district court's September 26, 2011 order dismissing the state-law claims and the district court's February 24, 2012 order granting Appellee Flores' motion for judgment on the pleadings. We affirm the district court's July 12, 2012, order dismissing the remaining § 187 claim. We remand the case to the district court for consideration of the state law claims against the defendants.

The question of whether removal of this matter from state court to federal court was proper is moot, as the Mall waived any claim to remand to state court once it pled § 303 and 28 U.S.C. § 1331 as a basis for jurisdiction in the SAC. In as much as only state claims remain, the district court may decide whether to continue to exercise supplemental

jurisdiction over the state claims or send them back to state court, as appropriate. *See* 28 U.S.C. § 1367(c).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Each party shall bear its own costs on appeal.