FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HARVINDER SINGH,
            *Plaintiff-Appellant*,

v.

AMERICAN HONDA FINANCE
CORPORATION,
            *Defendant-Appellee.*

No. 17-35964

D.C. No.
2:17-cv-00287-
JCC

HARVINDER SINGH,
            *Plaintiff-Appellant*,

v.

SORAYA MOTOR CO.; ARIANNA
MOTOR COMPANY INC.; HOOMAN H.
BODAGHI, DBA HINSHAW'S HONDA;
HONDA OF AUBURN; HOOMAN
HONDA; HOOMAN MOTORS GROUP;
HINSHAW ACURA; HOOMAN ACURA,
            *Defendants-Appellees.*

No. 17-35967

D.C. No.
2:17-cv-00287-
JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted March 4, 2019
Seattle, Washington

Filed May 30, 2019

Before:  Ronald M. Gould and Richard A. Paez, Circuit
Judges, and Cynthia A. Bashant,[*] District Judge.

Opinion by Judge Gould

## SUMMARY[**]

### Class Action Fairness Act

The panel affirmed the district court's grant of summary
judgment to defendants in a putative class action against the
American Honda Finance Corporation and various car
dealerships alleging defendants failed to provide plaintiff
with add-ons that were promised in the Dealer Addendum
when plaintiff bought his new Honda Accord.

Plaintiff brought a putative class action in Washington
state superior court, and defendant American Honda Finance
Corporation removed the case to federal court under the
Class Action Fairness Act.  Plaintiff moved to remand, but
the district court denied that motion.  Plaintiff then amended
his complaint to assert a federal claim under the Truth in

---

[*] The Honorable Cynthia A. Bashant, United States District Judge
for the Southern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

Lending Act.  After further motion practice and discovery, the district court granted summary judgment for defendants and dismissed plaintiff's claims.

The panel first held that plaintiff preserved his objection that removal was improper because he timely moved to remand the case to state court following removal.  The panel held that the district court did not have subject-matter jurisdiction over this action at the time of removal because the Class Action Fairness Act's home state exception barred the exercise of jurisdiction. The home state exception applied because the dealership defendants were the primary defendants responsible for the direct harm to consumers and two-thirds or more of the members of the proposed plaintiff classes in the aggregate were citizens of Washington State. The panel nevertheless held that the district court had subject-matter jurisdiction at the time it rendered a final decision on the merits, because plaintiff voluntarily amended his complaint to assert a federal Truth in Lending Act claim.

On the merits, the panel held that the district court properly granted summary judgment to the dealership defendants and the American Honda Finance Corporation. The panel concluded that considering all the extrinsic evidence offered, plaintiff had not demonstrated a genuine issue of material fact as to whether he was promised an add-on that he did not receive.  The panel also determined that the district court did not abuse its discretion in denying plaintiff's request for more time for discovery.

**COUNSEL**

Robert Joseph Gaudet Jr. (argued), Karin Gaudet-Asmus, Seattle, Washington; Hardeep S. Rekhi and Gregory Wolk, Seattle, Washington; for Plaintiff-Appellant.

Sean Ashley Commons (argued), Sidley Austin LLP, Los Angeles, California; Aaron Paul Riensche (argued) and Jeffrey D. Dunbar, Seattle, Washington; Bruce Hamlin, Lane Powell PC, Seattle, Washington; Michael C. Andolina, Sidley Austin LLP, Chicago, Illinois; for Defendant-Appellee.

**OPINION**

GOULD, Circuit Judge:

Plaintiff-Appellant Harvinder Singh purchased a new Honda Accord from Hinshaw's Honda in Auburn, Washington. To finance his purchase, Singh obtained financing from Defendant-Appellee American Honda Finance Corporation ("AHFC").[1] Singh later brought this suit as a putative class action in Washington state superior court against AHFC and the Dealership Defendants. AHFC removed the case to federal court under the Class Action Fairness Act ("CAFA"). Singh moved to remand, but the district court denied that motion. Singh then amended his

---

[1] The other Defendants-Appellees in this action are Soraya Motor Co., Arianna Motor Company, Inc., Hooman H. Bodaghi, Honda of Auburn, Hooman Honda, Hooman Motors Group, Hinshaw Acura, and Hooman Acura. We refer to these entities and Hinshaw's Honda, collectively, as the "Dealership Defendants." Singh alleges that Hooman Bodaghi owns or is the alter ego of each of the named dealerships.

complaint to assert a federal claim under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601–1667f. After further motion practice and discovery, the district court granted summary judgment for the Dealership Defendants and AHFC and dismissed Singh's claims.

On appeal, Singh contends that the district court lacked subject-matter jurisdiction at the time of removal and, for that reason, erred when it denied his motion to remand. Singh also contends that the district court erred in granting summary judgment against him. Finally, Singh contends that the district court did not permit him sufficient discovery before granting summary judgment.

We hold that the district court did not have subject-matter jurisdiction over this action at the time of removal because CAFA's home state exception barred the exercise of jurisdiction. However, the district court had subject-matter jurisdiction at the time it rendered a final decision on the merits, because Singh voluntarily amended his complaint to assert a federal TILA claim. "To wipe out the adjudication postjudgment, and return to state court a case now satisfying all federal jurisdictional requirements, would impose an exorbitant cost on our dual court system, a cost incompatible with the fair and unprotracted administration of justice." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 77 (1996). We decline to impose such a cost.

On the merits, we hold that the district court properly granted summary judgment to the Dealership Defendants and AHFC. We also hold that the district court did not abuse its discretion in denying Singh's request for more time for discovery. We affirm the district court's judgment in full.

# I

In February 2016, Singh bought a new Honda Accord from Hinshaw's Honda in Auburn, Washington. The Accord had two stickers. The first sticker listed the car's standard features and a Manufacturer's Suggested Retail Price ("MSRP") of $28,670.00.[2]



The other sticker listed a "dealer price" of $29,505.00, as well as individual costs for three dealer add-ons: "3M," "Pro Pak," and "New Car Detail & Dealer Prep" ("Dealer Prep").[3] With the add-ons, the listed price of the car was $30,632.00.

---

[2] We refer to this sticker as the "MSRP Sticker."

[3] We refer to this sticker as the "Dealer Addendum."



Singh negotiated the price of his new Accord down to $27,356.97, before taxes and fees. Singh did not know what the add-ons were when he purchased the car, nor did anyone

at Hinshaw's explain them to him. Singh nonetheless thought he was paying for the add-ons because they were listed on the Dealer Addendum and he was not given the chance to decline them. To finance his purchase, Singh obtained financing from AHFC.

Singh signed three documents when he purchased his Accord: (1) a Purchase Order, (2) a Sales Contract, and (3) a Retail Installment Sale Contract ("RISC"). Singh also initialed a mandatory disclosure form. The Purchase Order listed the base price of the car as $27,356.97—the price Singh negotiated. Under the heading "ACCESSORIES," it stated, "sold w/ prep" and "pro pkg (muds, tray, locks)." The Sales Contract listed the "Base Price of Vehicle and Options" as $27,356.97. It did not list any items under the "Dealer Added or Deleted Options" heading. The RISC provided the terms of Singh's financing agreement with AHFC and listed the total vehicle price of the Accord, including taxes, licensing, and other fees. The RISC did not list any add-ons. Finally, on the "Mandatory Disclosure Statement," Singh declined additional services and protections, including "Rock Guard Chip Protect."

Singh brought this putative class action in Washington state superior court.[4] Singh claimed that Hinshaw's did not provide him the three add-ons it promised on the Dealer Addendum—3M, Pro Pak, and Dealer Prep—and, if he had known what the add-ons were, he would have declined them and paid a lower price for his Accord. Singh claimed that the other Dealership Defendants engaged in similar unlawful practices. Singh further alleged that AHFC profits from the

---

[4] At the time, the suit also named Gursharan Laddi and Jasvi Kaur as plaintiffs. Those plaintiffs withdrew when Singh amended his complaint in federal court.

Dealership Defendants' nondisclosures because the nondisclosures lead to higher car prices, which lead to higher interest payments to AHFC from financing agreements with vehicle purchasers.  Singh asserted four causes of action against the Dealership Defendants and AHFC: (1) breach of contract; (2) violation of the duty of good faith and fair dealing; (3) negligent supervision; and (4) violation of the Washington Consumer Protection Act ("WCPA").

AHFC removed the case to federal court under CAFA. Singh moved to remand, contending that either the home state or the local controversy exception to CAFA barred the exercise of federal subject-matter jurisdiction.  The district court rejected those arguments and denied Singh's motion. Singh then amended his complaint to assert a federal TILA claim.

The Dealership Defendants moved for summary judgment and the district court granted that motion.  On Singh's breach of contract claim, the district court explained that the contract between Singh and Hinshaw's consisted of "the Sales Contract . . . RISC . . . and possibly the Vehicle Purchase Order"—the documents Singh had signed. Because none of those documents mentions 3M, Pro Pak, or Dealer Prep, the district court held that those add-ons were not part of the bargain between Hinshaw's and Singh and, for that reason, Hinshaw's did not breach its contract with Singh even if it did not provide the add-ons.[5]  The district

---

[5] In the district court, Singh also contended that Hinshaw's committed a per se breach by violating Washington's Auto Dealer's Practices Act.  The district court rejected that theory, and Singh does not raise it on appeal.  Thus, that theory has been abandoned. *See, e.g.*, *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

court granted summary judgment against Singh on his WCPA claim because (1) Hinshaw's did not violate Washington's Auto Dealer's Practices Act[6] and (2) Singh did not demonstrate injury insofar as he paid less than the MSRP of the car. Finally, the district court granted summary judgment against Singh on his TILA claim because the contract did not include any add-ons and therefore their costs did not need to be itemized in the RISC.[7]

Separately, AHFC moved to dismiss Singh's claims against it under Federal Rule of Civil Procedure 12(b)(6). As part of its motion, AHFC included a copy of the RISC. Singh had not attached the RISC to his complaint, so he objected to its consideration at the motion-to-dismiss stage. But Singh's response included ninety-one pages of declarations and exhibits, which likewise were not attached to his complaint. Because each party cited materials outside the complaint, the district court converted AHFC's motion to dismiss into a motion for summary judgment and "deferred consideration of the motion to allow Singh a reasonable opportunity to present all material that would be pertinent."

---

[6] Singh does not re-assert violations of this law as a basis for his WCPA claim on appeal and has thus abandoned this theory. *See, e.g.*, *Smith*, 194 F.3d at 1052.

[7] Singh does not challenge the district court's ruling on his TILA claim. Any challenge on this ground has been abandoned. *See, e.g.*, *Smith*, 194 F.3d at 1052. The district court also granted summary judgment against Singh on his claims for breach of the duty of good faith and fair dealing and negligent supervision. Singh does not challenge those rulings on appeal. Any challenge to those rulings has been abandoned. *See, e.g.*, *Smith*, 194 F.3d at 1052.

After further discovery, Singh objected that he had not received adequate time for discovery.  The district court declined to permit Singh more time because Singh had propounded discovery requests on the defendants for two months, he attached a slew of documents obtained in discovery to his responses to the motions for summary judgment, and he did not point to any facts that he lacked.

On the merits, the district court granted summary judgment against Singh on his breach of contract claim because Singh could not show that AHFC violated any financing terms of the RISC, the only contract between AHFC and Singh.**[8]**  The district court granted summary judgment for AHFC on Singh's WCPA claim because AHFC was not directly involved in the allegedly deceptive practice of displaying the Dealer Addendum on vehicles.**[9]** Finally, the district court noted that Singh had abandoned his TILA claim against AHFC, although he reserved the right to seek reinstatement.

Singh filed timely notices of appeal.  He contends that the district court lacked subject-matter jurisdiction over this action at the time of removal and therefore erred when it denied his motion to remand.  He asks that this case be

---

**[8]** The district court also rejected Singh's theories that AHFC committed a breach of contract because (1) it was in a joint venture with the Dealership Defendants and they committed a breach, or (2) because AHFC violated Washington's Auto Dealer's Practices Act.  Singh does not challenge those rulings on appeal.  Any challenge to those rulings has been abandoned.  *See, e.g.*, *Smith*, 194 F.3d at 1052.

**[9]** The district court also granted summary judgment against Singh on his claims for breach of the duty of good faith and fair dealing and negligent supervision.  Singh does not challenge those rulings on appeal. Any challenge to those rulings has been abandoned.  *See, e.g.*, *Smith*, 194 F.3d at 1052.

remanded to Washington state court. In the alternative, Singh contends that the district court erred in granting summary judgment to the defendants, or that it erred in granting summary judgment without permitting him sufficient discovery.

## II

We review de novo whether the district court had subject-matter jurisdiction. *Chapman v. Deutsche Bank Nat'l Tr. Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011) (per curiam). We review any factual findings relevant to jurisdiction for clear error. *Id.*

We review de novo whether the district court properly granted summary judgment to the Dealership Defendants and AHFC. *Hunt v. City of L.A.*, 638 F.3d 703, 709 (9th Cir. 2011). We review the district court's denial of Singh's "request for a continuance of summary judgment pending further discovery . . . for an abuse of discretion." *Michelman v. Lincoln Nat. Life Ins. Co.*, 685 F.3d 887, 892 (9th Cir. 2012). We may affirm on "any ground supported by the record." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008).

## III

As an initial matter, the parties disagree whether the district court had subject-matter jurisdiction to render a decision on the merits. Singh contends that jurisdiction did not exist at the time of removal because two CAFA exceptions—the local controversy exception and home state exception—barred the exercise of federal subject-matter jurisdiction. The defendants contend that those exceptions are inapplicable. They alternatively contend, relying on *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996), and *Retail*

*Property Trust v. United Board of Carpenters and Joiners of America*, 768 F.3d 938 (9th Cir. 2014), that this case should not be remanded to state court—even if subject-matter jurisdiction did not exist when AFHC removed the case—because Singh voluntarily amended his complaint after he was in federal court to assert a federal TILA claim, thereby establishing federal-question jurisdiction.  Singh, relying on *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004), responds that jurisdiction must be determined as of the time of removal.

To better understand the parties' dispute and the relevant law that frames our inquiry, we start with the Supreme Court's decision in *Grubbs v. General Electric Credit Corporation*, 405 U.S. 699 (1972).  In *Grubbs*, General Electric Credit Corporation ("GECC") sued Grubbs in state court.  *Id.* at 700.  In response, Grubbs initiated a cross-action against the United States government.  *Id.*  The government removed the case to federal court.  *Id.*  GECC did not object to removal, and the case was eventually tried. *Id.* at 701.  On appeal, the Court of Appeals raised the issue of jurisdiction *sua sponte* and dismissed.  *Id.* at 702.  The Supreme Court reversed.  The Court explained that in situations where a removed case is tried and decided on the merits without objection, "the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court."  *Id.* at 703.  Applying that principle, the Court held that jurisdiction existed when the district court rendered its judgment and, for that reason, the Court of Appeals should not have dismissed the case.  *Id.* at 704.

In the wake of *Grubbs*, we held that a party challenging the propriety of removal had to preserve any such objection

by timely moving to remand and then appealing any adverse remand determination. *See, e.g.*, *Gould v. Mut. Life Ins. Co. of N.Y.*, 790 F.2d 769, 774 (9th Cir. 1986); *Lewis v. Time, Inc.*, 710 F.2d 549, 552 (9th Cir. 1983); *Sheeran v. Gen. Elec. Co.*, 593 F.2d 93, 97–98 (9th Cir. 1979). "[W]hen there [was] no appeal of a denial of a remand motion and the case [was] tried on the merits, the issue on appeal [was] whether the federal court would have had jurisdiction had the case been filed in federal court in the posture it had at the time of the entry of the final judgment." *Lewis*, 710 F.2d at 552; *accord Carpenters Health & Welfare Tr. Fund for Cal. v. Tri Capital Corp.*, 25 F.3d 849, 852 (9th Cir. 1994), *overruled on other grounds by S. Cal. IBEW-NECA Tr. Funds v. Standard Indus. Elec. Co.*, 247 F.3d 920 (9th Cir. 2001). At least one other circuit applied a similar rule. *See, e.g.*, *Kidd v. Sw. Airlines, Co.*, 891 F.2d 540, 546 (5th Cir. 1990).

Then came *Caterpillar Inc. v. Lewis*, 519 U.S. 61, the case on which the defendants rely. The plaintiff there had filed suit in state court on personal injury claims. *Id.* at 64. "The case was removed to a federal court at a time when . . . complete diversity of citizenship did not exist among the parties." *Id.* The plaintiff moved to remand the case, but the district court denied the motion. *Id.* Before trial, the nondiverse defendants settled, and at the time of trial, complete diversity existed between the parties. *Id.* The defendant prevailed at trial, but "[t]he Court of Appeals vacated the judgment, concluding that, absent complete diversity at the time of removal, the District Court lacked subject-matter jurisdiction." *Id.*

The Supreme Court reversed. The Court first held that the plaintiff, "by timely moving for remand, did all that was required to preserve his objection to removal." *Id.* at 74. The

Court then explained that the flaw in the case was a "statutory flaw—Caterpillar's failure to meet the [28 U.S.C.] § 1441(a) requirement that the case be fit for federal adjudication at the time the removal petition is filed"—not a "jurisdictional defect." *Id.* The jurisdictional defect, the lack of complete diversity at the time of removal, was cured when complete diversity was established before trial. *Id.* at 73. The Court noted that if the jurisdictional defect had remained through the time when the judgment was entered, however, the judgment would have to be vacated. *Id.* at 76–77. But the Court concluded that the district court properly exercised subject-matter jurisdiction notwithstanding the initial statutory flaw. The Court explained: "Once a diversity case has been tried in federal court, with rules of decision supplied by state law under the regime of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), considerations of finality, efficiency, and economy become overwhelming." *Id.* at 75. It went on: "To wipe out the adjudication postjudgment, and return to state court a case now satisfying all federal jurisdictional requirements, would impose an exorbitant cost on our dual court system, a cost incompatible with the fair and unprotracted administration of justice." *Id.* at 77.

The Supreme Court revisited this line of authority in *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, the case on which Singh relies. There, the parties were nondiverse when the plaintiff filed its complaint in federal court because the plaintiff was a partnership with "two partners who were Mexican citizens,"[10] while the defendant was a Mexican corporation. *Id.* at 569. Despite the initial

---

[10] Partnerships are citizens of each state or foreign country of which any partner is a citizen. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 192–195 (1990).

lack of diversity, complete diversity was achieved just before trial when the two Mexican partners left the partnership. *Id.* The case proceeded to a six-day trial. *Id.* The Supreme Court framed the question before it as "whether a party's post-filing change in citizenship can cure a lack of subject-matter jurisdiction that existed at the time of filing in an action premised upon diversity of citizenship." *Id.*

Answering that question negatively, the Court held that federal subject-matter jurisdiction was lacking. *Id.* at 572–76. The Court started with the proposition that "[i]t has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Id.* at 570 (quoting *Mollan v. Torrance*, 9 Wheat. 537, 539 (1824)). The Court then distinguished *Caterpillar*, explaining that "*Caterpillar* broke no new ground," the "jurisdictional defect [there] had been cured by the dismissal of the party that destroyed diversity"—a "method of curing a jurisdictional defect [that] had long been an exception to the time-of-filing rule." *Id.* at 572. The Court further explained that the "holding of *Caterpillar* . . . is only that a statutory defect—'Caterpillar's failure to meet the § 1441(a) requirement that the case be fit for federal adjudication at the time the removal petition is filed'—did not require dismissal once there was no longer any jurisdictional defect," in light of "considerations of finality, efficiency, and economy." *Id.* at 574 (quoting *Caterpillar*, 519 U.S. at 73, 75). Finally, the Court noted that it had "never approved a deviation from the rule . . . that where there is no change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit." *Id.* (quotation, emphasis, and alteration omitted). Because the "[t]he purported cure" to the jurisdictional defect in *Grupo Dataflux* "arose not from a change in the parties to the action,

but from a change in the citizenship of a continuing party"—
a cure the Court had refused to permit "for the past
175 years"—the Court held that federal subject-matter
jurisdiction did not exist. *Id.* at 575–76.

Under *Grubbs*, *Caterpillar*, and *Grupo Dataflux*, our
inquiry is three-fold when, as here, it is alleged that federal
subject-matter jurisdiction did not exist at the time of
removal but existed at the time of final judgment. First, has
the party contesting jurisdiction preserved the contention
that removal was improper?   Second, was there a
jurisdictional defect at the time of removal and, if so, was it
properly cured before the entry of final judgment so that
federal subject-matter jurisdiction existed at the time of final
judgment? Third, if no jurisdictional defect remained at the
time of final judgment, do "considerations of finality,
efficiency, and economy," outweigh the statutory defect in
the case—a party's "failure to meet the [28 U.S.C.]
§ 1441(a) requirement that the case be fit for federal
adjudication at the time the removal petition is filed"—such
that dismissal would be inconsistent "with the fair and
unprotracted administration of justice"?   *Caterpillar*,
519 U.S. at 73, 75, 77.[11]   We consider these questions in
turn.

---

[11] At least two of our sister circuits apply a similar framework. *See,
e.g.*, *Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*, 756 F.3d 327, 333–
34 (5th Cir. 2014) ("So *Caterpillar* analysis involves three
considerations: first, whether a meritorious removal challenge has been
preserved; second, whether a post-removal development cured the defect
that existed at removal; and third, whether the case was tried on the
merits such that finality and economy preclude remand."); *Gentek Bldg.
Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 327 (6th Cir. 2007).
And no circuit, so far as we can determine from our review of the cases,
has squarely held to the contrary.

## A

Our first question is whether Singh preserved his objection to removal.  If not, then *Grubbs* controls and "the issue . . . on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed" in federal court at the time of final judgment.  405 U.S. at 703.

In *Caterpillar*, the Supreme Court held that a party preserves a challenge to removal by timely moving to remand.  519 U.S. at 74; *see also Camsoft Data Sys., Inc.*, 756 F.3d at 333–34 (relying on *Caterpillar* to hold that a party preserved its objection to removal by timely moving to remand).  A party need not do more.[12]  Here, Singh timely moved to remand this case to Washington state court after removal.  Doing so preserved his objection that removal was improper.

The defendants nonetheless contend that Singh "waived any ability to challenge removal."  They rely on our decision in *Retail Property Trust*, 768 F.3d 938.  We held there that "[t]he question whether the district court erred in denying" the plaintiff's motion to remand was moot because the plaintiff's "assertion of federal jurisdiction in the [second amended complaint] conferred jurisdiction upon the district court and hence upon us."  *Id.* at 949 n.6.  Contrary to the defendants' assertion, *Retail Property Trust* did not rest on waiver grounds.  Instead, we applied the rule, discussed below, that when a plaintiff voluntarily asserts a federal

---

[12] *Caterpillar* effectively overruled our decisions that required a plaintiff to immediately appeal an adverse determination on a motion to remand to preserve the issue for appeal.  *See, e.g.*, *Gould*, 790 F.2d at 774; *Lewis*, 710 F.2d at 552; *Sheeran*, 593 F.2d at 97–98.

claim after removal, doing so establishes federal subject-matter jurisdiction and cures any jurisdictional defect that may exist in the case.  This is clear from our citations to cases applying that rule: *Moffitt v. Residential Funding Co., LLC*, 604 F.3d 156, 159 (4th Cir. 2010), *Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 56 (2d Cir. 1996), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016), and *Bernstein v. Lind–Waldock & Co.*, 738 F.2d 179, 185 (7th Cir. 1984).

## B

Our second question is whether this case had a jurisdictional defect at the time of removal and, if so, whether that defect was cured by proper means before the entry of final judgment.

Certain acts properly cure jurisdictional defects.  For example, in *Caterpillar*, the jurisdictional defect—lack of complete diversity—was cured when the nondiverse party was dismissed, a "method of curing a jurisdictional defect [that] had long been" accepted. *Grupo Dataflux*, 541 U.S. at 572.  Others do not.  The jurisdictional defect in *Grupo Dataflux*—lack of complete diversity—was not cured because a party's citizenship in a federal action is determined as of the time of filing and later changes to that citizenship cannot create or destroy diversity. *See id.* at 575–76.  "[I]f, at the end of the day and case, a jurisdictional defect remains uncured, the judgment must be vacated." *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 736 (9th Cir. 2011) (emphasis omitted) (quoting *Caterpillar*, 519 U.S. at 76–77); *see also Rodas v. Seidlin*, 656 F.3d 610, 616 (7th Cir. 2011) (explaining that *Grubbs* and *Caterpillar* "do not apply to jurisdictional defects").

Here, we hold that the district court lacked jurisdiction at the time of removal, but it had jurisdiction at the time of summary judgment because the defect was properly cured. We explain each point in turn.[13]

## 1

AHFC removed this action from state court under CAFA.[14]   Under CAFA, a district court has original jurisdiction over a class action where: "(1) there are one-hundred or more putative class members; (2) at least one class member is a citizen of a state different from the state of any defendant; and (3) the aggregated amount in controversy exceeds $5 million, exclusive of costs and interest." *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (citing 28 U.S.C. § 1332(d)(2), (5)(B), (6)). Congress enacted CAFA to "curb perceived abuses of the class action device which, in the view of CAFA's proponents, had often been used to litigate multi-state or

---

[13] We note that a court need not analyze whether jurisdiction existed at the time of removal under the framework we have set out.  It may simply assume that jurisdiction did not lie and then consider whether any jurisdictional defect was cured.  We consider whether jurisdiction existed at the time of removal here because this case implicates CAFA's home state exception, and in particular the meaning of the term "primary defendants."  We have previously declined to address the meaning of that term, *see Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1024–25 (9th Cir. 2007), so we find it appropriate to address the issue here.  It has been fully briefed and we have a sufficient record.  Moreover, if jurisdiction existed at the time of removal, that would necessarily end our inquiry.

[14] "A defendant generally may remove a civil action if a federal district court would have original jurisdiction over the action."  *Allen v. Boeing Co.*, 784 F.3d 625, 628 (9th Cir. 2015) (citing 28 U.S.C. § 1441(a)).

even national class actions in state courts." *United Steel v. Shell Oil Co.*, 602 F.3d 1087, 1090 (9th Cir. 2010) (quoting *Tanoh v. Dow Chem. Co.*, 561 F.3d 945, 952 (9th Cir. 2009)).

CAFA "contains several exceptions to its grant of removal jurisdiction . . . ." *Bridewell-Sledge v. Blue Cross of Cal.*, 798 F.3d 923, 928 (9th Cir. 2015). Relevant here is the so-called "home state" exception,[15] which provides that a "district court shall decline to exercise jurisdiction" over a class in which "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B). It is Singh's burden to show that the exception applies, *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 883 (9th Cir. 2013), because "CAFA should be read with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant," *Bridewell-Sledge*, 798 F.3d at 929 (quotation omitted). The parties contest only whether AHFC is a "primary defendant," which would render the home state exception inapplicable; they otherwise agree that the other requirements are satisfied.

CAFA "does not define 'primary defendant.'" 2 William B. Rubenstein, *Newberg on Class Actions* § 6:20 (5th ed. 2018 update). Courts have thus looked to "numerous factors" to define the term. *Id.*

---

[15] Singh also invokes the so-called "local controversy" exception. *See* 28 U.S.C. § 1332(d)(4). Because we conclude that the home state exception applies, we do not consider the local controversy exception.

The Third Circuit, synthesizing various decisions and relying heavily on CAFA's legislative history, has explained that

> courts tasked with determining whether a defendant is a "primary defendant" under CAFA should assume liability will be found and determine whether the defendant is the "real target" of the plaintiffs' accusations. In doing so, they should also determine if the plaintiffs seek to hold the defendant responsible for its own actions, as opposed to seeking to have it pay for the actions of others. Also, courts should ask whether, given the claims asserted against the defendant, it has potential exposure to a significant portion of the class and would sustain a substantial loss as compared to other defendants if found liable.

*Vodenichar v. Halcon Energy Props., Inc.*, 733 F.3d 497, 505–06 (3d Cir. 2013). Applying those principles, the Third Circuit held in *Vodenichar* that a defendant was a "primary defendant" because it was alleged to be directly liable to the plaintiffs and liability was apportioned "equally among the defendants." *Id.* at 506; *see also Hunter v. City of Montgomery*, 859 F.3d 1329, 1337 (11th Cir. 2017) (relying on *Vodenichar* to hold that a city was a "primary defendant," but a private company was not, because the private company could only be vicariously or secondarily liable).

The Fifth Circuit considered the "primary defendant" requirement in *Hollinger v. Home State Mutual Insurance Co.*, 654 F.3d 564 (5th Cir. 2011). There, one group of defendants, the "County Mutuals," allegedly issued

insurance policies in violation of the Texas Insurance Code. *Id.* at 568. The other group of defendants, the "Reinsurers," allegedly "participated in and permitted such violations." *Id.* The Fifth Circuit held that the "County Mutuals" were "the primary defendants, because all putative class members, by definition, have claims against the County Mutuals, and as the entities that issued the insurance policies, the County Mutuals have a primary role in the alleged discrimination." *Id.* at 572.

The Fifth Circuit revisited the "primary defendant" requirement in *Watson v. City of Allen*, holding that the Texas legislature and local municipalities were "primary defendants" because those legislative bodies had enacted the "legislative scheme" that the suit sought to declare unconstitutional. 821 F.3d 634, 641 (5th Cir. 2016). By contrast, the Fifth Circuit held that three private companies were not "primary defendants" because the claims against them were "expressly contingent on a threshold finding that the challenged legislative scheme [was] unconstitutional." *Id.*

Aligning ourselves with our sister circuits, we hold that a court analyzing whether a defendant is a "primary defendant" for purposes of CAFA's home state exception should first assume that all defendants will be found liable. The court should then consider whether the defendant is sued directly or alleged to be directly responsible for the harm to the proposed class or classes, as opposed to being vicariously or secondarily liable. The court should also consider the defendant's potential exposure to the class relative to the exposure of other defendants. Courts should not treat these considerations as exhaustive or apply them mechanistically. The inquiry is whether a defendant is a "'principal,' 'fundamental,' or 'direct'" defendant. *Vodenichar*, 733 F.3d

at 504 (relying on *Merriam-Webster's Collegiate Dictionary* 923 (10th ed. 2002) to define "primary"). Finally, we agree that "by using the word 'the' before the words 'primary defendants' rather than the word 'a,' [CAFA] requires remand under the home state exception only if all primary defendants are citizens of" the alleged home state. *Id.* at 506; *see also* Rubenstein, *Newberg on Class Actions* § 6:20 ("Most courts agree that the use of the definite article in 'the primary defendants' requires that all of the primary defendants be citizens of the state in which the action was originally filed."). It is insufficient that only some of the primary defendants are citizens of that state.

With these principles in mind, we turn to the allegations in this case. The operative complaint at the time of removal named (1) AHFC, (2) Soraya Motor Co., (3) Arianna Motor Company, Inc., and (4) Hooman H. Bodaghi, d/b/a Hinshaw's Honda, Green River Leasing, Honda of Auburn, Hooman Honda, Hooman Motors Group, Paul Hinshaw Acura, and Hooman Acura, as defendants. Singh described the "Defendants" as "auto dealers and manufacturers doing business in King County, Washington." Singh alleged that Hooman Bodaghi either owned or was the alter ego of each of the named dealerships. He further claimed that "Defendants" unlawfully charge customers for vehicle add-ons that they do not include and which cannot be declined. Singh alleged that AHFC "provides the financing for vehicles sold or leased by Defendants to the Plaintiffs" and "knows or should know that all of the customers are misled and improperly charged." AHFC allegedly "profit[s] from the misconduct of the other Defendants" by receiving additional interest under financing agreements with vehicle purchasers. Each cause of action is asserted against all defendants.

Contrary to the district court's determination, we hold that the foregoing allegations show that the Dealership Defendants are the primary defendants and AHFC is a secondary defendant. The Dealership Defendants—all of whom are allegedly controlled in some manner by Hooman Bodaghi—are allegedly responsible for the direct harm to consumers: improperly charging for vehicle add-ons. AHFC's alleged liability stems from permitting this conduct and benefitting from it in the form of additional interest payments. In other words, AHFC's liability depends on a "threshold finding" that the Dealership Defendants acted unlawfully, demonstrating that AHFC is a secondary defendant. *See Watson*, 821 F.3d at 641. Moreover, it appears that the Dealership Defendants have more exposure to the class because the alleged benefit to AHFC is interest charged on improper add-ons, whereas the alleged benefit to the Dealership Defendants is the full cost of the add-ons. *See Vodenichar*, 733 F.3d at 505–06.

In holding that AHFC is a primary defendant, the district court explained in part that AHFC would be directly liable to the class for all claims because each claim in the complaint was asserted against "Defendants," without differentiating between them. It was not enough, however, for the district court to look only at what claims were asserted against which defendants. Although doing so can help determine whether a defendant is directly or secondarily liable to the class and the relative exposure among defendants, a mechanical review of how many claims are asserted against a defendant is inappropriate. Here, although Singh asserts each cause of action against all defendants, Singh's description of the parties shows that AHFC benefits from the alleged misconduct of the Dealership Defendants and is, in that sense, a secondary defendant.

The district court also found that AHFC was a primary defendant because it "has the most resources by which to 'satisfy a potential judgment.'" We disagree that AHFC's ability to satisfy a potential judgment was a relevant consideration here.[16] Nothing in the record indicates that the Dealership Defendants would be unable to satisfy any judgment rendered against them.

Because the Dealership Defendants, the primary defendants, and "two-thirds or more of the members of all proposed plaintiff classes in the aggregate . . . are citizens of" Washington State, the home state exception applies. 28 U.S.C. § 1332(d)(4)(B). The district court did not have subject-matter jurisdiction over this action at the time of removal.

**2**

Our inquiry into jurisdiction is not at an end, however. After the district court denied Singh's motion to remand, Singh voluntarily amended his complaint to assert a federal TILA claim.

We have previously held that when a plaintiff voluntarily amends his or her complaint after removal to assert a federal claim, that amendment cures any jurisdictional defect and establishes federal subject-matter jurisdiction. *See Retail Prop. Tr.*, 768 F.3d at 949 n.6 (holding that "[t]he question whether the district court erred in denying" the plaintiff's motion to remand was moot because the plaintiff's "assertion of federal jurisdiction in the [second amended complaint] conferred jurisdiction upon the district court and

---

[16] We express no view on whether this is a relevant consideration in a future case.

hence upon us"); *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1046 n.3 (9th Cir. 2000) ("Once in federal court, Chabner amended his complaint to add a claim under the ADA, thereby raising a federal question. . . . [B]ecause the ADA claim raised a federal question, subject matter jurisdiction existed at the time the district court entered judgement [sic]. Therefore, this case was properly in federal court."). So too have other courts. *See Pegram v. Herdrich*, 530 U.S. 211, 215 n.2 (2000) ("Herdrich does not contest the propriety of removal before us, and we take no position on whether or not the case was properly removed . . . . Herdrich's amended complaint alleged ERISA violations, over which the federal courts have jurisdiction, and we therefore have jurisdiction regardless of the correctness of the removal."); *Moffitt*, 604 F.3d at 159; *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1280 (11th Cir. 2005); *Barbara*, 99 F.3d at 55–56; *Bernstein*, 738 F.2d at 185.

Our previous holdings are dispositive here. By voluntarily amending his complaint to assert a federal claim, Singh established federal subject-matter jurisdiction and cured any jurisdictional defect that existed at the time of removal.[17]

---

[17] If Singh had involuntarily amended his complaint, then the case may be different. *See O'Hallaran v. Univ. of Wash.*, 856 F.2d 1375, 1380 (9th Cir. 1988). But there is no evidence of coercion here. The case would also be different if Singh had tried to amend his complaint to eliminate federal subject-matter jurisdiction. *See Broadway Grill, Inc. v. Visa Inc.*, 856 F.3d 1274, 1277 (9th Cir. 2017). Singh relies on *Broadway Grill*, and similar cases, to contend that jurisdiction must be determined as of the time of removal, but they are inapposite because they concern attempts to amend to avoid or eliminate federal subject-matter jurisdiction. *See Chabner*, 225 F.3d at 1046 n.3 ("Although normally jurisdiction must be analyzed on the basis of the pleadings filed

Singh contends that it does not matter that he amended his complaint to assert a TILA claim because he abandoned his TILA claim before summary judgment.   Singh misconstrues the record.  Even if Singh abandoned his TILA claim against AHFC, Singh did not abandon his TILA claim against the Dealership Defendants.   The district court expressly ruled on that claim in its summary-judgment decision.  The district court had jurisdiction under 28 U.S.C. § 1331 to adjudicate Singh's TILA claim against the Dealership Defendants, and it had supplemental jurisdiction under 28 U.S.C. § 1367(a) to adjudicate Singh's claims against AHFC.  *See Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1288 (9th Cir. 2013) (supplemental jurisdiction proper under 28 U.S.C. § 1367(a) where claims arise from a "common nucleus of operative facts").

## C

"[A] statutory flaw—[AHFC's] failure to meet the [28 U.S.C.] § 1441(a) requirement that the case be fit for federal adjudication at the time the removal petition is filed"—nonetheless "remain[s] in the unerasable history of the case." *Caterpillar*, 519 U.S. at 73.  We thus address whether "considerations of finality, efficiency, and economy" outweigh the statutory defect such that dismissing this case now and remanding it to state court would be inconsistent "with the fair and unprotracted administration of justice." *Caterpillar*, 519 U.S. at 75, 77.

---

at the time of removal without reference to subsequent amendments, that rule applies mainly in cases where the amended complaint attempts to destroy federal jurisdiction after the case has been properly removed." (quotation omitted)).

Our decisions suggest that "considerations of finality, efficiency, and economy" may be insufficient when there is no final judgment on the merits.  *See Abada v. Charles Schwab & Co.*, 300 F.3d 1112, 1114–17 (9th Cir. 2002); *see also McAteer v. Silverleaf Resorts, Inc.*, 514 F.3d 411, 416 (5th Cir. 2008).  They also suggest that those considerations may be insufficient "where the judgment reached by the trial court must be reversed on the merits and the case remanded to the trial court for further proceedings."  *Prize Frize, Inc. v. Matrix (U.S.) Inc.*, 167 F.3d 1261, 1266 (9th Cir. 1999); *see also Huffman v. Saul Holdings Ltd. P'ship*, 194 F.3d 1072, 1080 (10th Cir. 1999).

But here, the district court resolved a number of Washington state law issues on the merits, "with rules of decision supplied by state law under the regime of *Erie R. Co. v. Tompkins*, 304 U.S. 64, (1938)."  *Caterpillar*, 519 U.S. at 75; *see also Lively v. Wild Oats Markets, Inc.*, 456 F.3d 933, 941 n.11 (9th Cir. 2006) (holding that summary-judgment decision is decision on the merits); *Gould*, 790 F.2d at 773 (holding the same).  Moreover, as explained below, we affirm the district court's decision on the merits.  "[C]onsiderations of finality, efficiency, and economy" counsel against dismissing this action. *Caterpillar*, 519 U.S. at 75.  "To wipe out the adjudication postjudgment, and return to state court a case now satisfying all federal jurisdictional requirements, would impose an exorbitant cost on our dual court system, a cost incompatible with the fair and unprotracted administration of justice."  *Id.* at 77.  We decline to impose such a cost.

* * *

The district court lacked subject-matter jurisdiction over this case at the time of removal.  But the district court had jurisdiction at the time of final judgment because Singh

asserted a TILA claim after removal.  Because the district court resolved all of Singh's claims on the merits, "considerations of finality, efficiency, and economy" counsel against dismissing this case now and remanding it to Washington state court.  We therefore proceed to the merits of Singh's appeal.

## IV

On the merits, Singh contends that the district court erred by granting summary judgment to the Dealership Defendants and AHFC on his breach of contract and WCPA claims.  We "must determine whether, viewing the evidence in the light most favorable to [Singh], any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law." *Hunt*, 638 F.3d at 709 (quoting *Fazio v. City & Cty. of S.F.*, 125 F.3d 1328, 1331 (9th Cir. 1997)).  Summary judgment is appropriate if the evidence is such that no reasonable jury could return a verdict for Singh.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## A

We first consider Singh's claims against the Dealership Defendants.

## 1

To prevail on his breach of contract claim, Singh must show an agreement between himself and the Dealership Defendants, a duty under the agreement, and a breach of that duty.  *Fid. & Deposit Co. of Md. v. Dally*, 201 P.3d 1040, 1044 (Wash. Ct. App. 2009).  In interpreting contracts, Washington "follow[s] the objective manifestation theory of contracts." *Hearst Commc'ns, Inc. v. Seattle Times Co.*,

115 P.3d 262, 267 (Wash. 2005). Courts are "to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Id.* Words in a contract are to be given "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* "[S]urrounding circumstances and other extrinsic evidence"—parol evidence—may be used "to determine the meaning of specific words and terms used" in the contract, but not to "show an intention independent of the instrument" or to "vary, contradict or modify the written word." *Id.* (emphasis omitted) (quoting *Hollis v. Garwall*, 974 P.2d 836, 843 (Wash. 1999)).

As explained, Singh signed three documents when he purchased his Accord: (1) a Purchase Order, (2) a Sales Contract, and (3) an RISC. None of these documents describes the features of the Accord Singh purchased; they instead give the stock number, year, make, model, and VIN of the Accord. Singh contends that we must consider parol evidence to determine the features of the Accord he was promised. Relying on extrinsic evidence—and in particular, the Dealer Addendum—Singh contends that Hinshaw's was contractually obligated to provide him the three add-ons listed on the addendum: 3M, Pro-Pak, and Dealer Prep. Singh contends that Hinshaw's breached its agreement when it did not include All-Season Floor Mats, which were purportedly included with Pro Pak, or 3M with his Accord.

Assuming without deciding that Singh is correct that we must consider extrinsic evidence to determine the features of the Accord he was promised, Hinshaw's did not breach its contract with Singh. Considering all the extrinsic evidence offered, Singh has not demonstrated a genuine issue of

material fact as to whether he was promised an add-on that he did not receive.

Turning first to whether Singh was promised and provided "3M," the Dealership Defendants' witnesses uniformly testified that "3M" refers to "door edge guards, which [are installed] on most new cars prior to them being placed on the lot."[18]  On that understanding of the term,

---

[18] Singh excerpts Tim Lasso's deposition to contend that witnesses used "3M" to describe a clear coat on the hood of a car.  However, the full excerpt of that testimony shows that Lasso was referring to "3M Full Kit," a different add-on:

> **Q.** What's a chip guard?
>
> **A.**  It's a plastic nose protectant for the car.  Clear plastic that's glued on the front third of the car.
>
> **Q.** Is it the same as 3M protection?
>
> **A.** Yeah.
>
> **Q.** Is it the same as the 3M Clear Bra?
>
> **A.** Yes.
>
> **Q.** So it goes by the name of Chip Guard?
>
> **A.** Well, I guess you can – no, it goes by the name of 3M Full Kit, what we use internally.  But also can go by Rock Guard or chip protectant.  You can use really any term you'd like.

Lasso confirmed this understanding later in his deposition by describing "3M Full Kit" as different than "door edge guards."

Singh has not shown a breach of contract because he does not claim that he was not provided door edge guards.

However, Singh offered the declaration of Ron Kayshel that "[b]ased on [his] understanding while [he] was employed at Hinshaw's Honda, 3M was a clear film that could be sprayed over the front hood of a car to protect its finish."[19]   Assuming that the declaration is sufficient to create a genuine dispute of fact as to the meaning of "3M," Singh still has not established a breach of contract.  If "3M" refers to "a clear film that could be sprayed over the front hood of a car to protect its finish," then Singh explicitly declined that add-on when he initialed the Mandatory Disclosure Statement and declined "Rock Guard Chip Protect."  The Mandatory Disclosure Statement explains that Rock Guard Chip Protect "[s]hields paint from any rock chips/bug damage," and witnesses uniformly testified that Rock Guard Chip Protect—which they also referred to as "3M Full Kit"—is a "clear bra that covers the front third of a vehicle."  In other words, Rock Guard Chip Protect is "3M," as Kayshel uses that term.  Singh explicitly declined that add-on.  He cannot assert breach of contract for something that was not part of the bargain.

If Singh had agreed to purchase "a clear film that could be sprayed over the front hood of a car to protect its finish," a charge of $999 for "3M Full Kit" would have appeared on his Sales Contract under the heading for "Dealer Added or Deleted Options," as evidenced by the sales contracts of two

---

[19] Singh also offered the declaration of Lewis Linet, Jr. (his expert). Linet, Jr. opined that "a very popular type of 3M is protection for a car hood."  The declaration does not explain how Hinshaw's used the term "3M," however.

former named plaintiffs in this case.[20]    Singh's Sales Contract does not include a charge for "3M Full Kit," confirming that he did not purchase it.

Turning to whether Singh was promised and provided "Pro Pak," witnesses uniformly testified that "Pro Pak" refers to "mud flaps, trunk tray, and wheel locks." This understanding is confirmed by Singh's Vehicle Purchase Order, which under the heading "ACCESSORIES," states, "pro pkg (muds, tray, locks)." Singh admits that his car came with these items. And an internal invoice, as well as a "New Vehicle Inventory" sheet, confirms the same.

To survive summary judgment, Singh contends that "Pro Pak" also includes All-Season Floor Mats, which he never received. He relies on an "accessories list" for the Accord, which lists a number of potential add-ons for various cars. The list does not support Singh's contention. The list details four different "protection packages" for the Accord. It lists a "Protection Package," which is undefined, for $453.90. It lists an "All-Season Protection Package," which is defined to include a "splash-guard set," "all-season floor mats," and "a trunk tray," for $549.60. It lists an "All-Season Protection Package I," which is defined to include a "splash-guard set," "all-season floor mats," and "wheel locks," for $458.30. And it lists an "All-Season Protection Package II," which is defined to include "all-season floor mats," "a trunk tray," and "wheel locks," for $549.60. None of these options include all four of the items Singh alleges he was promised: mud flaps, a trunk tray, wheel locks, and All-Season Floor Mats.   Nor does Singh explain which of the various

---

[20] One of the Dealership Defendants' witnesses confirmed that when a customer purchases "3M Full Kit," or "Rock Guard," Hinshaw's fills in the "Dealer Added or Deleted Options" section on the Sales Contract.

protection package options he was allegedly promised. He instead pulls products from each. Doing so is insufficient to create a genuine dispute of material fact as to the meaning of "Pro Pak" in light of uniform testimony that it includes "mud flaps, trunk tray, and wheel locks," and in light of the notation on Singh's Vehicle Purchase Order stating "pro pkg (muds, tray, locks)."

The "accessories list" also cuts against Singh's argument. Although the "Protection Package" for the Accord is undefined, the "Protection Package" for the Civic includes "wheel locks," "trunk tray," and "splash guard set"—*i.e.*, the items Singh received. The Civic also has an "All-Season Protection Package" and "All-Season Protection Package II" that mirror those of the Accord, suggesting that the available packages are the same across cars. The "Protection Package" for the CR-V likewise includes "wheel locks," "trunk tray," and "splash guard set," as does the "Protection Package" for the CR-T, Pilot, HR-V, and Odyssey. Given the items included in the "Protection Packages" for other Hondas, the reasonable inference is that the "Protection Package" for the Accord includes "wheel locks," a "trunk tray," and a "splash guard set"—the accessories Singh received. Singh has not pointed to any evidence that he was promised All-Season Floor Mats.

Finally, as to Dealer Prep, the Dealership Defendants' witnesses testified that the dealerships generally clean a car when the car arrives on the lot. The dealerships also "clean and detail that car again prior to delivery [to customers]. And [they] put a fee for that on the" Dealer Addendum—"Dealer Prep." Singh's Vehicle Purchase Order states it was "sold w/ prep," and an internal Hinshaw's invoice and "New Vehicle Inventory" sheet reflect the time spent cleaning his car.

Singh contends that, in charging him for "Dealer Prep," Hinshaw's improperly charged Singh twice for cleaning because the cost of cleaning is allegedly included in the MSRP of a car. How this allegation relates to his theories of liability, however, is unclear. In any event, it is unsupported by the record. First, as explained, "Dealer Prep" refers to an additional cleaning after a car has been cleaned once and has been sitting on the lot, but before it is delivered to a customer. Singh was not charged twice for one cleaning. Second, Singh has not presented sufficient evidence to create a dispute of fact as to whether the MSRP of his Accord included the cost of cleaning. Singh's expert, Lewis Linet, Jr., surmised that, because the MSRP Sticker states that the "Total Vehicle Price (Includes Pre-Delivery Service)," and based on his experience, Hinshaw's double-charged Singh and other customers for preparing cars for delivery. But there is no evidence to show that "Pre-Delivery Service" refers to cleaning, or to the same cleaning as "Dealer Prep." Singh was promised that his car would be cleaned before it was delivered, and it was. Singh has not shown a breach of contract on this point.

Because Singh has adduced no evidence that he was promised something he did not receive, the district court correctly granted summary judgment to the Dealership Defendants on Singh's breach of contract claim.

## 2

To prevail on his WCPA claim, Singh "must establish five distinct elements: (1) [an] unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to [Singh] in his . . . business or property; (5) [and] causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). The first two elements "may be established

by a showing that the alleged act constitutes a per se unfair trade practice. A per se unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated." *Id.* at 535.

Singh contends that the Dealer Addendum was misleading in violation of Washington Revised Code § 46.70.180(1),[21] establishing a per se violation of the WCPA. Specifically, he contends that the Dealer Addendum falsely promised him an Accord with Pro Pak, 3M, and Dealer Prep, but he did not receive those add-ons. In other words, Singh effectively repackages his breach of contract claim as a WCPA claim.[22] Because, as we have explained, Singh has adduced no evidence that he was promised something he did not receive, no reasonable jury could conclude that the Dealership Defendants violated the WCPA. The district court correctly granted summary

---

[21] That statute prohibits car dealerships from advertising or disseminating "any statement or representation with regard to the sale, lease, or financing of a vehicle which is false, deceptive, or misleading . . . ." Wash. Rev. Code § 46.70.180(1).

[22] Singh does not contend that the Dealer Addendum was misleading insofar as the terms were not clearly defined. In his reply brief, he suggests that "the fact that Defendants use multiple names for the same products is misleading, deceptive, and/or unfair," but he cites no authority for this proposition, nor does he offer any analysis beyond this unsupported conclusion. Such limited analysis does not adequately raise the issue on appeal. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) (issues raised for first time in reply brief generally not addressed). Nor does Singh contend that the alleged "double charging" for Dealer Prep is a deceptive practice.

judgment to the Dealership Defendants on Singh's WCPA claim.

## B

As to Singh's claims against AHFC, AHFC's asserted liability is predicated on the theory that AHFC was either aware of or had a role in the Dealership Defendants' unlawful conduct—their alleged breach of contract or violations of the WCPA.   Because the Dealership Defendants neither committed a breach of contract nor violated the WCPA, Singh's claims against AHFC fail.  The district court correctly granted summary judgment to AHFC.

Singh contends that AHFC may be "liable under TILA" because it participated in the "Dealership Defendants' scams."   But Singh abandoned his TILA claim against AHFC in the district court; it is not before us on appeal. *See United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990).[23]

## V

Finally, we consider Singh's challenges to the district court's decision to convert AHFC's motion to dismiss into a motion for summary judgment.  Singh first contends that the district court incorrectly believed that he did not oppose the conversion. That contention is irrelevant.  The district court correctly converted AHFC's motion into one for summary

---

[23] As part of his argument that the district court improperly granted summary judgment to AHFC, Singh contends that the district court erred by striking portions of one of his response briefs.  In light of Singh's extensive use of footnotes, the district court was well within its discretion to strike three pages from his brief. *See King Cty. v. Rasmussen*, 299 F.3d 1077, 1082–83 (9th Cir. 2002).

judgment when the parties cited materials extrinsic to the complaint, and the district court provided Singh notice and an opportunity to respond.  The district court committed no error on this point.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) ("[T]he general rule in this circuit, as in others, is that a district court may not grant a motion to dismiss which has been converted into a summary judgment motion without furnishing all parties an opportunity to supplement the record . . . .").

Singh next contends that he was provided inadequate time for discovery.  Under Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant" to a motion for summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  "The denial of a request for a continuance of summary judgment pending further discovery is reviewed for an abuse of discretion.  A district court abuses its discretion only if the party requesting a continuance can show that allowing additional discovery would have precluded summary judgment."  *Michelman*, 685 F.3d at 892.

Here, Singh relied on hundreds of pages of declarations, deposition transcripts, and admissions in opposing the defendants' motions for summary judgment.  Those documents form a sizeable record on appeal.  Singh offers conclusory statements that he needed further discovery, but Singh has not "identif[ied] the specific facts that further

discovery would have revealed or explain[ed] why those facts would have precluded summary judgment." *Tatum v. City & Cty. of S.F.*, 441 F.3d 1090, 1100 (9th Cir. 2006). We cannot say the district court abused its discretion in denying Singh's request for further discovery. *See Michelman*, 685 F.3d at 892.

## VI

We hold that the district court had subject-matter jurisdiction over this case at the time of the final judgment. We decline to order that this case be remanded to state court because the case has been fully adjudicated on the merits and it satisfies all jurisdictional requirements. On the merits, we affirm the district court's grant of summary judgment to all defendants.

**AFFIRMED.**